[No. 55692–0. En Banc. February 1, 1990.]

VIRGIL T. HOWELL, ET AL, *Appellants*, v. SPOKANE
& INLAND EMPIRE BLOOD BANK, ET AL,
*Respondents*.

*John P. Lynch,* for appellants.

*Randall & Danskin, P.S.,* by *Michael J. Myers* and *Keith D. Brown,* for respondent Spokane & Inland Empire Blood Bank.

*Etter & McMahon, P.S.,* by *Stephen M. Lamberson* and *William F. Etter,* for respondent Deaconess Medical Center.

DOLLIVER, J.—In early October 1984, plaintiff Virgil T. Howell was admitted to defendant Deaconess Medical Center for elective knee surgery. Following the surgery, plaintiff's surgeon ordered two units of packed red blood cells be administered to plaintiff. The blood, provided by defendant Spokane & Inland Empire Blood Bank (SIEBB), was transfused into plaintiff on October 8, 1984. The blood had been donated to the SIEBB during the fall of 1984 by volunteer donor John Doe X. One of these units of blood is alleged to have contained the Human Immuno Deficiency

Virus (HIV). HIV is associated with the development of Acquired Immune Deficiency Syndrome (AIDS). Plaintiffs allege that prior to the surgery there was no appraisal given by the defendants of the potential risk of exposure to HIV via blood transfusions. Plaintiffs also allege the defendants failed to inform plaintiff of the procedure, available to elective surgery patients, for storing the patient's own blood for later transfusion.

After recovery from surgery, plaintiff Virgil Howell, a lifetime blood donor, continued to donate blood to the SIEBB. Following a donation, the SIEBB learned, in November 1985, that plaintiff tested positive for HIV. Plaintiff was not informed of this exposure until October 1986.

Plaintiffs Virgil Howell and his wife Geraldine Howell brought an action in the Superior Court for Spokane County pleading 12 causes of action against various defendants, including the SIEBB and Deaconess. The causes of action pleaded against both the SIEBB and Deaconess were negligence, res ipsa loquitur, negligent infliction of emotional distress, violation of the Consumer Protection Act (RCW 19.86), strict liability, breach of express and implied warranty, and loss of consortium. The plaintiffs also alleged a lack of informed consent against Deaconess and negligence per se, outrage, and fraudulent concealment and nondisclosure against the SIEBB.

Pursuant to motions for summary judgment brought by defendants SIEBB and Deaconess, the trial court entered orders granting partial summary judgment in favor of defendants. Partial summary judgment was ordered in favor of the SIEBB regarding strict liability, express and implied warranty, and violation of the Consumer Protection Act. Partial summary judgment in favor of Deaconess was ordered regarding strict liability, express and implied warranty, violation of the Consumer Protection Act, lack of informed consent, negligence per se, outrage, and res ipsa loquitur. Plaintiffs' motions for reconsideration were denied.

Plaintiffs brought a motion for pretrial review of the orders granting partial summary judgment pursuant to RAP 2.2(d) and RAP 4.2. We found the trial court's orders were not appealable, but granted discretionary review under RAP 2.3. We affirm in part and reverse in part.

■ At the outset, we reverse the trial court's dismissal of the claims of outrage and negligence per se against Deaconess. Plaintiffs did not allege these claims against Deaconess, although they were alleged against the SIEBB and other defendants who are not parties to this appeal. We also dispose of plaintiffs' challenge to the trial court's dismissal of their express warranty claims against the SIEBB and Deaconess. Plaintiffs made this challenge in their assignments of error, however, plaintiffs did not support this issue with argument either in their opening brief or their reply brief. If a party fails to support assignments of error with legal arguments, they will not be considered by this court. *Cyrus v. Martin,* 64 Wn.2d 810, 813, 394 P.2d 369 (1964).

Four issues remain. The first is whether plaintiffs' claims of strict liability and implied warranty against the SIEBB and Deaconess were properly dismissed by the trial court. Initially, we must determine whether the 1985 amendment to RCW 70.54.120 applies retroactively to bar these claims based upon a blood transfusion occurring before the amendment was enacted. After June 10, 1971, and prior to the effective date of the 1985 amendment, RCW 70.54.120 provided:

The procurement, processing, storage, distribution, administration, or use of whole blood, plasma, blood products and blood derivatives for the purpose of injecting or transfusing the same, or any of them, into the human body is declared to be, for all purposes whatsoever, the rendition of a service by each and every person, firm, or corporation participating therein, and is declared not to be covered by any implied warranty under the Uniform Commercial Code, Title 62A RCW, or otherwise, and no civil liability shall be incurred as a result of any such acts, except in the case of wilful or negligent conduct: *Provided, however,* That this section shall apply only to liability alleged in the contraction of hepatitis and malaria and shall

not apply to any transaction in which the blood donor receives compensation: . . . *Provided further,* That nothing in this section shall be considered by the courts in determining or applying the law to any blood transfusion occurring before June 10, 1971 and the court shall decide such case as though this section had not been passed.

*See* Laws of 1971, ch. 56, § 1, p. 131. On May 16, 1985, the Governor approved legislation amending the first proviso of the statute to include "acquired immune deficiency disease" after malaria as one of the diseases to which the statute is applicable. Laws of 1985, ch. 321, § 1, p. 1103.

 Statutory enactments are presumed to be prospective unless there is a legislative intent to apply the statute retroactively or the statute is remedial and retroactive application furthers the remedial purpose. *Ferndale v. Friberg,* 107 Wn.2d 602, 732 P.2d 143 (1987). Remedial statutes are those involving practice, procedure, or remedies and not affecting contractual or vested rights. *See Daggs v. Seattle,* 110 Wn.2d 49, 750 P.2d 626 (1988); *Godfrey v. State,* 84 Wn.2d 959, 530 P.2d 630 (1975). Statutory amendments are also presumed to be prospective unless there is a legislative intent to the contrary or the amendment is clearly curative. *Johnson v. Continental West, Inc.,* 99 Wn.2d 555, 663 P.2d 482 (1983); *Painting & Decorating Contractors of Am., Inc. v. Ellensburg Sch. Dist.,* 96 Wn.2d 806, 638 P.2d 1220 (1982). In determining legislative intent, this court may look to the express language of the statute, the purpose of the statute, and a legislative statement of strong public policy that would be served by retroactive application. *Ferndale v. Friberg, supra* at 605; *In re Marriage of MacDonald,* 104 Wn.2d 745, 748, 709 P.2d 1196 (1985).

Because we find RCW 70.54.120 and its 1985 amendment are not remedial or curative in nature, a contrary legislative intent must be found to defeat the presumption for prospective application.

The express language of this statute indicates an intent for retroactive application. RCW 70.54.120 clearly states the statute will be deemed to be effective prospectively

from June 10, 1971. *See* RCW 70.54.120. The legislative retention of the specific June 10, 1971, date in the statute after an amendment evidences a legislative intent of immunity for transfusions after that date which resulted in AIDS. The purpose of the statute and its legislative history also advocate a retroactive application. The purpose behind Washington's blood shield statute is to encourage a readily available supply of blood and blood products. *See Garvey v. St. Elizabeth Hosp.,* 103 Wn.2d 756, 759, 697 P.2d 248 (1985). This public policy accords with the general policy of the 48 states which have enacted blood shield statutes. *See Samson v. Greenville Hosp. Sys.,* 295 S.C. 359, 363, 368 S.E.2d 665 (1988). The original bill later codified in RCW 70.54.120 was first introduced in the House in 1971. *See* House Journal, 42d Legislature (1971), at 83. The original bill was a general statute of immunity with no language limiting its application to hepatitis and malaria. *See* House Journal, 42d Legislature (1971), at 83, 285; Senate Journal, 42d Legislature (1971), at 550.

Senator Gissberg, the Chairman of the Senate Judiciary Committee, explained the reason the House and Senate Judiciary Committees recommended restricting the application of the Washington statute to hepatitis and malaria.

> Those two diseases [hepatitis and malaria], we learned, are such that there is no way that you can tell from an examination of the blood whether or not it is infected with hepatitis or malaria. As a consequence, the bill now reads that the implied warranty doctrine is abolished only for the two situations that I just mentioned, hepatitis and malaria. The applicability of the act then only applies to malaria and hepatitis.

Senate Journal, 42d Legislature (1971), at 550. The statute was enacted and codified in RCW 70.54.120. The legislative history of the 1985 amendment does not address the reasons why the Legislature sought to include AIDS in the application of RCW 70.54.120. However, the medical research and information known about AIDS prior to May 1985, when the act passed the House and Senate, is instructive as to its inclusion.

In June and July 1981, the first few cases of AIDS were diagnosed. *See Kozup v. Georgetown Univ.,* 663 F. Supp. 1048, 1051 (D.D.C. 1987) (provides a chronology of medical research and information about AIDS), *aff'd in part, vacated in part,* 851 F.2d 437 (D.C. Cir. 1988). In December 1982, when an infant was diagnosed as suffering from AIDS, the medical community first focused upon blood transfusions as a source of transmission. *Kozup,* at 1051. However, it was not until 1984 that the medical community reached a consensus that AIDS was transmissible by blood. *Kozup,* at 1052. The cause of AIDS, the HTLV–III virus, was identified in April 1984. *Kozup,* at 1052. At this time, there was no way of detecting whether blood was infected with HIV. *Kozup,* at 1052.

It was in this context that the amendment to RCW 70.54.120 was introduced in and subsequently passed by the Legislature. Fortunately, by May 1985, the month the amendment passed the House and Senate, the ELISA (enzyme–linked immunosorbent assay) test had been developed which screens for the antibodies sensitive to HIV. *Kozup,* at 1052–53. This test has proved 98.6 percent effective, and when coupled with a second test, the Western Blot Analysis, the detection rate is 100 percent. *Kozup,* at 1053.

While the comments of individual legislators are insufficient to establish legislative intent, statements made on the floor by the chairman of the committee in charge of the bill may be taken as the opinion of the committee as to the meaning of the bill. *Snow's Mobile Homes, Inc. v. Morgan,* 80 Wn.2d 283, 291, 494 P.2d 216 (1972); *Johnson v. Continental West, Inc., supra* at 561. The comments by Senator Gissberg as to the original act are instructive as to the subsequent inclusion of AIDS at a time when there was no available method to screen blood for AIDS. In 1971, the Legislature apparently intended to protect the adequate flow of blood products in this state by providing for liability only in cases of negligence when there was no way to screen blood for hepatitis or malaria. In 1985, faced with a similar

situation involving AIDS, the Legislature included AIDS within the application of RCW 70.54.120. It would not appear consistent with the history and purpose of the statute to interpret the amendment to apply prospectively only. The Legislature would then be allowing strict liability and implied warranty claims at a time when there was no available method to test for the virus.

Given nothing more than this legislative history, the purpose of the statute, and the retention of the June 10, 1971, date in the statute, the legislative intent would seem to indicate a retroactive application of the 1985 amendment.

██ We must turn, however, to the colloquy on the floor of the House of Representatives at the time of the passage of the AIDS amendment in 1985. At that time the following exchange took place between Representative Dellwo and Representative Locke:

> Mr. Dellwo: "Representative Locke, is it the intent of this legislation to make the removal of strict liability as to AIDS retroactive to 1971, the date mentioned in the current statute?"
>
> Mr. Locke: "No, Representative Dellwo. This legislation materially and affirmatively changes the existing law and substantive rights. This legislation thus is an amendment to the 1971 law. Amendments are presumed to operate prospectively unless the legislation is remedial and concerns procedure or forms of remedies. This legislation is not remedial and does not concern procedure or forms of remedies, and thus may not apply retroactively. Furthermore, I have spoken with Senator Zimmerman, the sponsor of this legislation, and Senator Granlund, the Chair of the Senate committee which considered and passed this legislation and both have said that it is their intent that this legislation apply prospectively. Both have indicated that, for strategic reasons given the lateness of the session, and since this amendment to Senate Bill 3804 is unnecessary, then the amendment should be defeated."

House Journal, 49th Legislature (1985), at 1453–54. A further colloquy was held between Representative Dellwo and Representative Brooks:

> Mr. Dellwo: "Representative Brooks, as the prime sponsor of a house bill identical in intent to ESB 3804 and almost identical in language, is it the intent of this legislation to make the

removal of strict liability as to AIDS retroactive to 1971, the date mentioned in the current statute?"

Mr. Brooks: "Representative Dellwo, no. I concur in the remarks of Representative Locke."

House Journal, 49th Legislature (1985), at 1454. This colloquy was directed toward an amendment which provided:

That nothing in this section shall be considered by the courts in determining or applying the law in any lawsuit in which it is alleged that a blood transfusion occurring before the effective date of this 1985 act caused a person to contract acquired immune deficiency disease and the court shall decide such case as though this section had not been passed[.]

House Journal, 49th Legislature (1985), at 1453. The amendment was defeated.

We believe, considering this colloquy and the specific assertions as to the intentions of the House and Senate sponsors of the legislation, that regardless of other evidence to the contrary, it was the intent of the Legislature to make the addition of AIDS to RCW 70.54.120 prospective rather than retroactive. We so hold.

 Because we find the 1985 amendment is not to be applied retroactively, we need next to determine if the transfusion of blood is considered a service or a sale by hospitals and blood banks under the common law. Although the origin of strict liability is in tort and breach of implied warranty arises from contract, both claims are based upon a sale of goods rather than a service. *See Reilly v. King Cy. Cent. Blood Bank, Inc.,* 6 Wn. App. 172, 492 P.2d 246 (1971); RCW 62A.2–106. Whether the claim is of strict liability or implied warranty, it is actionable only as to defective products but not to defective services. *Roberts v. Suburban Hosp. Ass'n, Inc.,* 73 Md. App. 1, 8, 532 A.2d 1081 (1987); *Barbee v. Rogers,* 425 S.W.2d 342, 346 (Tex. 1968); Sales, *An Overview of Strict Tort Liability in Texas,* 11 Hous. L. Rev. 1043, 1066 (1974).

While we recently held in *Washington Water Power Co. v. Graybar Elec. Co.,* 112 Wn.2d 847, 774 P.2d 1199, 779 P.2d 697 (1989) that the Washington product liability act, RCW 7.72, preempts previously existing common law

product liability remedies, "human blood and its components" are expressly excluded from coverage under the act. *See* RCW 7.72.010(3)–(5). Thus, the common law governs the resolution of plaintiffs' strict liability and implied warranty claims. *See* RCW 7.72.020. Both claims may be analyzed together for purposes of determining if summary judgment was properly granted.

In *Gile v. Kennewick Pub. Hosp. Dist.*, 48 Wn.2d 774, 296 P.2d 662, 59 A.L.R.2d 761 (1956), we stated that a patient is not in the hospital to purchase goods, including blood, but rather to receive services. *Gile* relied on *Perlmutter v. Beth David Hosp.*, 308 N.Y. 100, 123 N.E.2d 792 (1954), which is the seminal case applying the service/sale distinction to cases involving the administration of blood by hospitals. In *Perlmutter*, the court reasoned that a blood transfusion, allegedly containing harmful impurities, was incidental and secondary to the hospital services and thus not within the provisions of sales law. *Perlmutter*, at 106. *Perlmutter* is the majority view with respect to transfusion cases against hospitals. *See generally Roberts v. Suburban Hosp. Ass'n, Inc., supra* at 12 n.6 (listing cases following *Perlmutter*). *But see, contra, Cunningham v. MacNeal Mem. Hosp.*, 47 Ill. 2d 443, 266 N.E.2d 897 (1970). (It should be noted that *Cunningham*, which rejected the service analysis, appears to be the only case refuting this view. *See Roberts v. Suburban Hosp. Ass'n, Inc., supra* at 13. Furthermore, the Illinois Legislature quickly overturned the *Cunningham* ruling. *See Glass v. Ingalls Mem. Hosp.*, 32 Ill. App. 3d 237, 336 N.E.2d 495 (1975).)

In agreement with *Perlmutter, Gile* characterized the relationship between the hospital and patient as one of service, not sale. *Gile*, at 781.

> We agree . . . that the contractual relationship between a hospital and a patient is not one of sale but is one of service; that during treatment in the hospital penicillin, casts, bandages, or blood, for which additional charges are made, may be transferred from the hospital to the patient; and yet the transfer is an incidental feature of the transaction and not a sale.

*Gile,* at 781. We approve of the reasoning in *Perlmutter* and *Gile.* It would be artificial to find the transfusion of blood to a patient as constituting a sale by the hospital. "[[O]ne who enters a hospital as a patient] goes there, not to buy medicine or pills, not to purchase bandages or iodine or serum or blood, but to obtain a course of treatment in the hope of being cured . . .". *Gile,* at 781 (quoting *Perlmutter v. Beth David Hosp., supra* at 107).

■ As to the SIEBB, the Court of Appeals in *Reilly v. King Cy. Cent. Blood Bank, Inc., supra,* held that at least prior to the enactment of RCW 70.54.120, the providing of blood by a nonprofit blood bank for a fee constituted a sale for the purposes of strict liability. The plaintiff in *Reilly* sought to recover for damages resulting from an attack of hepatitis suffered due to transfusions of blood furnished by the blood bank. The court stated:

> The transaction in this case has all the attributes of a sale. There was a transfer of property through the mutual consent of competent parties for a consideration in money paid, or to be paid. If the operation of respondent [blood bank] in extracting, typing, bottling, storing, matching, delivering, and charging money for blood is characterized as a service, it is only for the purpose of avoiding the strict liability rule . . .

(Citations omitted.) *Reilly,* at 175. Some jurisdictions have made a distinction between hospitals and blood banks and have allowed strict liability and breach of warranty claims against blood banks because they are collectors or distributors of blood rather than providers of medical services. *See Roberts v. Suburban Hosp. Ass'n, Inc., supra* (listing cases drawing distinction between blood banks and hospitals). However, we decline to draw such a distinction.

The purposes of strict liability are not furthered when applied to blood and blood products, an issue not discussed in *Reilly. See Seattle–First Nat'l Bank v. Tabert,* 86 Wn.2d 145, 542 P.2d 774 (1975); *Spellmeyer v. Weyerhaeuser Corp.,* 14 Wn. App. 642, 544 P.2d 107 (1975). First, the societal need to ensure an affordable, adequate blood supply furnishes a persuasive reason for distinguishing between victims of defective blood and victims of other defective

products. Second, *strict liability cannot provide an incentive* to promote all possible accident prevention at a time when there was no possible means of screening the blood for HIV. Third, while the producers may be in a better position to spread the costs, it is not in society's best interest to have the price of a transfusion reflect its true costs. In addition, both the blood bank and the hospital are in the distribution chain of providing blood to patients as a service. Although the blood bank does charge a fee for the blood, the blood bank is a nonprofit entity providing a service for the community.

For the foregoing reasons we hold the trial court correctly dismissed plaintiffs' strict liability and implied warranty claims against defendants Deaconess and the SIEBB. Any language in *Reilly v. King Cy. Cent. Blood Bank, Inc., supra,* which might suggest a contrary result is disapproved.

Plaintiffs' second challenge is to the trial court's dismissal of their lack of informed consent claim against Deaconess. Plaintiffs appear to make two separate arguments in support of an independent duty of defendant hospital, Deaconess, to secure an informed consent. First, plaintiffs contend the doctrine of corporate negligence encompasses a duty by the hospital to obtain informed consent. The doctrine of corporate negligence was adopted in *Pedroza v. Bryant,* 101 Wn.2d 226, 677 P.2d 166 (1984). In *Pedroza,* the court found that hospitals have a duty to exercise reasonable care in selecting, retaining, and supervising the performance of their medical staff. *Pedroza,* at 229. This theory is inapposite in this case. Plaintiffs do not contend the hospital was negligent in retaining or supervising Dr. Danielson. Rather, they allege the hospital should have obtained informed consent. The doctrine of corporate negligence does not encompass a claim for lack of informed consent.

Second, plaintiffs argue RCW 7.70.050 places a duty upon the hospital to obtain an informed consent. RCW 7.70.050 provides that "health care providers" are

subject to suit for breach of the duty to secure an informed consent by a patient. While RCW 7.70.020(3) includes hospitals as health care providers, the Court of Appeals in *Alexander v. Gonser,* 42 Wn. App. 234, 711 P.2d 347 (1985), *review denied,* 105 Wn.2d 1017 (1986) refused to interpret the statute as demanding equal informed consent obligations for all entities and individuals encompassed within the definition of health care provider. Rather, the Court of Appeals, after noting the delicate nature of the physician/patient relationship, stated:

> Any duty to inform Mrs. Alexander of the test results would have been that of her privately retained physician, not the hospital or its personnel. To hold a hospital or its employees have a duty to intervene in the independent physician/patient relationship, *unless the hospital is aware of circumstances more extraordinary than those in the record before this court,* would be far more disruptive than beneficial to a patient.

(Footnote and citations omitted. Italics ours.) *Alexander,* at 239. We approve of this interpretation of RCW 7.70.050. Under RCW 7.70.020(1)–(3), every "person licensed by this state to provide health care or related services", every "employee or agent of a person described . . . above", and every "entity . . . employing one or more persons described . . . above" is defined as a health care provider. To provide for equal informed consent obligations as to every person and entity falling within the definition would not be justified. This is particularly true in the present case given that the hospital did not have any specific knowledge regarding plaintiff. The hospital and its staff could only have been aware of the general risk equally applicable to all patients. This general information of a risk of a procedure is more properly left to the attending physician.

In the alternative, plaintiff argues this case presents the extraordinary circumstances needed under *Alexander v. Gonser, supra* at 239, to create an independent duty on the part of the hospital to inform plaintiff as to the available knowledge about AIDS at the time of the transfusion. In *Alexander,* the plaintiff, who was at full term pregnancy, was involved in a car accident. After the initial examination

by emergency room staff and plaintiff's physician, plaintiff, under direction of her physician, underwent fetal heart monitoring. The nurse monitoring the fetal heart tones contacted the physician at home reporting that the results were equivocal. The physician directed the plaintiff be released to return the following morning for additional monitoring. The nurse did not inform plaintiff of the equivocal results. The following morning, fetal distress was diagnosed and an infant was delivered thereafter diagnosed as permanently brain damaged. The court held the hospital did not have a duty to inform the plaintiff of the equivocal results. *Alexander,* at 239.

The hospital in the present case, however, did not possess knowledge of circumstances more extraordinary than those before the court in *Alexander.* The physician ordered the blood transfusions, just as the physician ordered the patient to go home in *Alexander.* It is the duty of the physician to inform patients of the risks, general or specific, involved in surgical procedures. Outside an extraordinary situation, the hospital staff is not under a duty to secure an informed consent from the patient. Such a cause of action is more properly brought against the physician ordering the transfusion. In this case, the physician is a defendant and is alleged to have failed to obtain an informed consent.

Other jurisdictions have not placed a duty upon hospitals to secure an informed consent. *See Pauscher v. Iowa Methodist Med. Ctr.,* 408 N.W.2d 355 (Iowa 1987); *Valcin v. Public Health Trust,* 473 So. 2d 1297 (Fla. Dist. Ct. App. 1984), *approved in part, quashed in part,* 507 So. 2d 596 (Fla. 1987); *Nevauex v. Park Place Hosp., Inc.,* 656 S.W.2d 923 (Tex. Ct. App. 1983); *Cox v. Haworth,* 54 N.C. App. 328, 283 S.E.2d 392 (1981); *Cooper v. Curry,* 92 N.M. 417, 589 P.2d 201 (Ct. App.), *writ quashed,* 92 N.M. 353, 588 P.2d 554 (1978). The claim was properly dismissed.

Plaintiffs' third challenge is to the trial court's dismissal of their Consumer Protection Act (CPA) claims against both the SIEBB and Deaconess. RCW 19.86.020 provides:

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

To establish a CPA claim, a private party must meet the following five requirements: (1) the act or practice must be unfair or deceptive; (2) the action had to occur in the conduct of trade or commerce; (3) there must be a sufficient showing of public interest; (4) there must be an injury to plaintiff's business or property; and (5) there must be a causal link between the unfair acts and the injury suffered. *Nordstrom, Inc. v. Tampourlos,* 107 Wn.2d 735, 739, 733 P.2d 208 (1987) (citing *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.,* 105 Wn.2d 778, 719 P.2d 531 (1986)).

As to the claim against defendant SIEBB, plaintiffs claim the SIEBB's actions in allegedly not disclosing its detection of HIV in plaintiff Virgil Howell's blood for over a year and then allegedly publicly stating that no AIDS contaminated blood was transfused in Spokane constitutes a prima facie CPA claim. However, plaintiffs have failed to meet the fifth requirement as a matter of law. "Only a person 'injured in his business or property *by* a violation of RCW 19.86.020 . . .' may bring a private action." *Hangman,* at 792–93. There is no causal link between the SIEBB's alleged failure to disclose the detection of HIV in plaintiff's blood or its later public statement and plaintiff's initial transfusion. The failure to disclose and the subsequent statement occurred after the transfusion and did not cause plaintiff's injury as a matter of law.

As to the claim against defendant Deaconess, plaintiffs contend the hospital's failure to secure an informed consent for the blood transfusion promoted the entrepreneurial aspects of the hospital by promoting the operation to increase profits, by increasing the volume of patients and by failing adequately to advise patients of risks and alternatives. Plaintiffs rely on *Short v. Demopolis,* 103 Wn.2d 52, 691 P.2d 163 (1984) and *Quimby v. Fine,* 45 Wn. App.

175, 724 P.2d 403 (1986) in support of their position. However, because Deaconess does not have a duty to secure an informed consent, plaintiffs' claim under the CPA fails as a matter of law.

The trial court's orders granting defendants' motions for summary judgment as to the CPA claims are affirmed.

Lastly, plaintiffs challenge the trial court's dismissal of their claim against Deaconess for violation of the doctrine of res ipsa loquitur. The trial court's dismissal of the doctrine raises the issue of whether res ipsa loquitur cannot be applied to allow an inference of negligence against the hospital or the blood bank as a matter of law. *See Jackson v. Criminal Justice Training Comm'n*, 43 Wn. App. 827, 829, 720 P.2d 457 (1986).

Three criteria must be met to apply res ipsa loquitur to a particular case.

> (1) [T]he occurrence producing the injury must be of a kind which ordinarily does not occur in the absence of negligence; (2) the injury is caused by an agency or instrumentality within the exclusive control of the defendant; and (3) the injury–causing occurrence must not be due to any contribution on the part of the plaintiff.

*Jackson*, at 829–30 (quoting *Brown v. Dahl*, 41 Wn. App. 565, 580, 705 P.2d 781 (1985)).

Plaintiff has not met the exclusive control requirement for application of the doctrine as a matter of law. The hospital did not have exclusive control over the transfused blood. The blood was donated by John Doe X, collected by the SIEBB, and transfused by the hospital. In this context, no one defendant can be said to have had exclusive control over the blood so as to infer negligence. Therefore, the trial court properly dismissed the application of res ipsa loquitur to infer negligence on the part of the hospital as a matter of law.

The order of the Spokane County Superior Court granting partial summary judgment in favor of the Spokane & Inland Empire Blood Bank is affirmed. The order of partial summary judgment in favor of Deaconess is reversed as to the dismissal of negligence per se and outrage since those

actions were never brought against Deaconess and affirmed as to all other claims.

CALLOW, C.J., UTTER, BRACHTENBACH, DORE, ANDERSEN, DURHAM, and SMITH, JJ., and PEARSON, J. Pro Tem., concur.