Earl W. GOSS, Jr. and Cheryl
Goss, Appellants,

v.

OKLAHOMA BLOOD INSTITUTE
and Mercy Health Center,
Inc., Appellees.

No. 71191.

Court of Appeals of Oklahoma,
Division No. 3.

Feb. 13, 1990.

As Amended on Grant of Rehearing
May 23, 1990.*

Certiorari Denied June 21, 1993.

---

* Editor's Note: On grant of rehearing the court withdrew part III of its original opinion and substituted part III as published herein. Judge MacGuigan dissented to Part III of the original opinion but concurred in the substituted Part III on grant of rehearing. The court denied appellant's petition for rehearing.

Larry Monard, Geary & Monard, Oklahoma City, for appellants.

Ronald R. Hudson, Holloway, Dobson, Hudson & Bachman, Oklahoma City, for appellee Mercy Health Center, Inc.

James D. Foliart, Larry D. Ottaway and Susan A. Short, Foliart, Huff, Ottaway & Caldwell, Oklahoma City, for appellee Oklahoma Blood Institute.

BAILEY, Judge:

Appellants seek review of the Trial Court's order granting summary judgment to Appellees. On September 17, 1984, Appellant Earl Goss underwent open heart surgery at Appellee Mercy Health Center, Inc. (Hospital), during which Appellant required transfusions of blood. Appellee Oklahoma Blood Institute (Institute) supplied the blood transfused, which had been obtained from a voluntary donor on September 12, 1984. The donor later tested positive for the Acquired Immuno-deficiency Syndrome (AIDS) virus, as did Mr. Goss. Mr. Goss subsequently developed several symptoms associated with the AIDS virus, and underwent treatment therefor.

Appellant Earl Goss, joined by his wife Appellant Cheryl Goss (hereinafter collectively Appellants), subsequently filed suit against Institute and Hospital, asserting liability of Appellees under strict liability, breach of implied warranty and negligence theories. In support of their negligence claims, Appellants alleged that Institute was negligent in its screening of potential donors and testing of donated blood, and

that Hospital was negligent in failing to inquire of Institute regarding its testing and screening procedures. Appellees Hospital and Institute answered, denying negligence, asserting that blood transfusions have unavoidable inherent dangers, that there were, at the time of the blood donation and subsequent transfusion to Appellant, no tests or screening procedures which could detect the AIDS virus or carriers thereof, and that Hospital and Institute had exercised due and reasonable care in the screening and selection of donors and blood products.

The parties exchanged interrogatories and document requests. The Appellees deposed Appellant Earl Goss, at which time Mr. Goss admitted that he knew of the potential for blood communicated disease before he underwent surgery. Institute then filed its motion for summary judgment. As to the Appellants' strict liability and breach of warranty claims, Institute asserted that 63 O.S.1981 § 2151 shielded Institute from liability thereunder. That section provides in pertinent part:

The procurement, processing, distribution or use of whole blood, plasma, blood products, blood derivatives and other human tissues such as corneas, bones or organs for the purpose of injecting, transfusing or transplanting any of them into the human body, for compensation or otherwise, shall be deemed a transaction for the purposes of this act. No such transaction shall give rise to any implied warranty of the fitness, quality, suitability of purpose, safety, or acceptability to the body of the patient or of any other characteristic or circumstance incident to the transaction involved bearing upon the propriety of the transaction, as applied to the recipient, on the part of the person or persons rendering such service, in the absence of negligence.

63 O.S.1981 § 2151.

As to the negligence claim, Institute offered the affidavit of the director of Institute, Dr. G., which showed lack of any test available at the time of donation and transfusion to detect the presence of the AIDS virus. Dr. G. also asserted that Institute

required all potential donors to review AIDS information, to certify that the donors had reviewed the material, and requested that donors within any of the at-risk categories described in the materials exclude themselves from donation. Dr. G. therefore asserted exercise of reasonable care and no breach of duty by Institute in its screening and testing of donors and blood donations.

Hospital joined in Institute's motion for summary judgment, also asserting immunity from liability under § 2151. Thereby, Hospital maintained that Dr. G.'s affidavit showed that blood transfusions have some inherent unavoidable dangers, and that Appellants had adduced no evidence to attribute the transmission of the AIDS virus to any negligence by Hospital. Hospital also introduced the affidavit of its Vice-president, who stated that Hospital had, previous to using Institute as a source of blood, determined (1) that Institute, the *only* local source of blood, adhered to all testing requirements mandated by the Bureau of Biologics/Federal Drug Administration and the American Association of Blood Banks, (2) that Institute used due care in its screening and testing of donors and blood products, and that therefore, Hospital had met its duty of care by investigating and using the reputable Institute as supplier of its blood products.

Appellants requested additional time to respond to the Appellees' motions for summary judgment, which the Trial Court granted, and Appellants deposed Dr. G. At his deposition, Dr. G. stated that an FDA approved test for AIDS virus was not available until March, 1985, and reiterated

that no tests existed at the pertinent time in 1984 to detect AIDS infected donors and/or blood products. Dr. G. also asserted that Institute met all screening and testing requirements of the FDA and the American Association of Blood Banks, and exceeded those mandates by requiring potential donors to review AIDS information and requesting donor self-exclusion if the donor fell within one of the at-risk categories. Dr. G. admitted, however, that Institute did not perform two "surrogate marker" tests then being employed on a temporary basis by two blood suppliers in California.[1] Dr. G. asserted that Institute did not employ the "surrogate marker" tests because surrogate tests were non-specific and not definitive,[2] resulting in rejection of viable and safe donors and blood without specific reason therefor, and consequently diminishing the available blood supply for transfusion needs.

Appellants then filed their responses to Appellees' motions for summary judgment. In response to that of Institute, and relying on the Oklahoma case of *Gilmore v. St. Anthony Hospital*, 598 P.2d 1200 (Okl. 1979), Appellants asserted that Dr. G.'s testimony that no other tests existed at the time did not constitute an absolute defense to Appellants' action, and that Dr. G.'s admission that Institute employed neither the anti-hepatitis B core antibody test nor the T4/T8 test created an unresolved issue of fact as to Institute's duty of care and/or breach of that duty, precluding summary judgment. Appellants also argued that Institute's policy of requesting donor self-exclusion, especially in voluntary group do-

---

1. "Surrogate marker" tests are tests employed to detect diseases or conditions which may be associated with a different condition for which the testing is employed. According to the deposition testimony, and having observed a relationship between the incidence of hepatitis type B and male homosexuality, one blood institute in California employed the "anti-hepatitis B core antibody" test to screen out potentially at-risk donors and blood products. One other blood bank, having observed a decrease in the ratio of "T helper lymphocytes" to "T suppressor lymphocytes" in AIDS sufferers, used a "T4/T8" test to measure the ratio and excluded samples showing a lowered ratio.

2. This conclusion, in hind-sight and in light of later-acquired knowledge, appears supported by the deposition testimony of Dr. G. The FDA never approved the anti-hepatitis B core antibody test or the T4/T8 test for AIDS screening. After the donor in the instant case tested positive for the AIDS virus using the newly developed and FDA approved test in 1985 when the donor sought to again donate blood, Institute also tested using the anti-hepatitis B core antibody test, and that test revealed negative results. Further, and according to the deposition testimony, carriers of the AIDS virus may or may not show depressed T4/T8 ratios.

nations during which the instant infected blood product was obtained, was insufficient for the purpose of excluding potentially at-risk donors and donations.[3] Appellants additionally asserted that 63 O.S. § 2151 amounted to a constitutionally prohibited special law under the Oklahoma Constitution, Article V, § 46, and violated the due process protections of Article II, § 7.

In response to Hospital's assertion of lack of evidence of Hospital's negligence in the transmission of the AIDS virus to Appellant Earl Goss, Appellants' submitted the affidavit of Mr. Goss, who asserted for the first time in the proceedings that Hospital had not informed him previous to surgery (1) of the risk ·of transmission of AIDS from blood transfusions, (2) an alternative procedure to transfusion, known as intra-operative salvage, or (3) the availability of direct donations by family members.[4] Appellants' also objected to the competency of the Hospital Vice-president to make the affidavit upon which Hospital based its allegation of exercise of due care.

The Trial Court, by letter ruling, denied the Appellees' motions for summary judgment, but later withdrew the orders to allow Appellees to respond to Appellants' objections to summary judgment. Hospital responded, maintaining the constitutionality of § 2151. Hospital further asserted that Appellants' alleged lack of information concerning the risk of transmission of AIDS by transfusion did not address Appellants' allegation of negligent selection of Institute by Hospital, or Hospital's evidence of reasonable care in the choice of Institute as its blood supplier, and by operation of Rule 13, such failure deemed Hospital's assertion of reasonable care admitted. Hospital also submitted an additional affidavit of its Vice-president asserting that Hospital's records showed that intraoperative salvage had, in fact, been used during Mr. Goss' surgical procedure.

Hospital also argued that the *Gilmore* case was distinguishable as involving blood product obtained through a paid-donor system (arguably presenting the issue of inviting donations from at-risk individuals), as opposed to the voluntary donation in the case at bar. Additionally, Hospital asserted that the blood bank/appellee in *Gilmore* "made no attempt [on summary judgment] to show the donor did not fall within the category of a dangerous or high risk donor," contrary to the evidence presented in the instant case, showing Institute to have attempted to pre-screen for at-risk individuals. See, *Gilmore*, 598 P.2d at 1205. Institute responded, asserting that it offered potential donors three different avenues for confidential self-exclusion, and further showing Appellants' failure to adduce evidence of any governmental or administrative mandate to undertake the testing which Appellants assert should have been accomplished.

The Trial Court subsequently granted summary judgment to Appellees by the following letter ruling:

1. The [Appellants'] right to recover under the theories of strict liability and, or implied warranty of fitness is barred by 63 O.S. 2151 which is found to be a constitutional expression of the legislature.

2. [Appellees'] motion for summary judgment is sustained with respect to that portion of [Appellants'] petition setting forth an action based on implied warranty of fitness or strict liability as being barred by statute.

3. [Appellants] present no evidence of negligence on the part of [Hospital] in its selection of [Institute] for its blood sup-

---

**3.** Dr. G. admitted in his deposition the possibility that a prospective donor in a voluntary group donation atmosphere might be unwilling to admit that the donor occupies an at-risk category.

**4.** Intraoperative salvage, also known as intraoperative autotransfusion, uses a machine initially invented by Dr. G. and another doctor, generically known as an autotransfuser, by which a patient's own blood is recovered during the sur-

gical process, cleansed, and returned to the patient. Dr. G. also testified as to a third method of donation, known as elective preoperative autotransfusion, by which, prior to surgery, a patient's own blood is collected and stored for use during the patient's surgery. This method, said Dr. G., is perhaps the safest method of transfusion.

ply or of contamination of blood while in [Hospital's] possession.

4. [Appellants] present no evidence of negligence on the part of [Institute] in its selection of donors, testing, storage, or in any other phase of dealing in blood.

5. It is not enough to show, as [Appellants] do, that there were other testing procedures available but not used or that there were other sources of blood available. In the face of affirmative statements by [Appellees'] witnesses, Dr. [G.] and [Hospital's Vice-president], that [Institute] complied with all pertinent, applicable standards for testing, [Appellants'] lack of evidence to the contrary is fatal to their claims of negligence against either [Hospital] or [Institute].

6. Motions of [Appellees] for summary judgment are sustained.

Appellants then filed their "Motion to Reconsider/Vacate" the orders granting summary judgment to Appellees. In addition to reurging the previously asserted grounds for denial of summary judgment, Appellants tendered the affidavit of Dr. L., expressing the opinion that "the procedure utilized by [Institute] in the screening and selection of donors was negligent and failed to meet an acceptable standard of care," and that Hospital "was negligent in failing to ascertain the methods which were used to get blood by [Institute] and their failure [sic] to advise patients of alternative methods available for obtaining blood such as directed donations." Appellees responded, objecting to the submission of the additional evidence by Appellants, not previously presented on motion for summary judgment.

The Trial Court denied Appellants' motion for reconsideration. Appellants commenced the instant appeal, again asserting (1) unconstitutionality of 63 O.S. § 2151 under the Oklahoma Constitution, and further (2) error in denying the motion for reconsideration in view of the new evidence presented therein arguably establishing Appellees' breach of duty and negligence, and (3) error in granting summary judgment to Appellees (a) in the presence of unresolved material fact questions concerning Appellees' breach of duty and/or negligence and (b) in that § 2151 does not bar a cause of action for breach of implied warranty in the presence of negligence.

We initially note only one case to have discussed the application of § 2151. In *Gilmore v. St. Anthony's Hospital*, 516 P.2d 248 (Okl.1973), the Supreme Court held, under § 2151, that a blood bank could not be held strictly liable for injuries from defects in blood supplied, but specifically recognized that an action for breach of implied warranty might still obtain if it was shown that the blood supplier had *negligently* breached its implied contract. 516 P.2d at 251. In that case, however, because the issue was not properly presented, the Supreme Court specifically reserved consideration of the issue of constitutionality of § 2151 for a later time. 516 P.2d at 252.

After remand, the case again came before the Supreme Court after the Trial Court granted summary judgment to Appellee blood bank. *Gilmore v. St. Anthony's Hospital*, 598 P.2d at 1201. The Supreme Court found material fact questions upon which reasonable men might differ concerning blood bank's exercise of care in its selection of donors, precluding summary judgment. 598 P.2d at 1206. As we find neither of the previous *Gilmore* cases dispositive of the issues raised in the instant case, we proceed to the argument of Appellants.

## I. APPELLANTS' CONSTITUTIONAL CLAIMS

■ In their challenge to the constitutionality of § 2151, Appellants assert that § 2151 is violative of the "special law" proscription of the Oklahoma Constitution, Art. V, § 46, and the due process guarantee of Art. II, § 7. These constitutional provisions establish:

No person shall be deprived of life, liberty or property without due process. Oklahoma Constitution, Art. II, § 7.

The Legislature shall not, except as otherwise provided in this Constitution, pass any local or special law authorizing:

For limitation of civil or criminal actions.

Oklahoma Constitution, Art. V, § 46.

Hereunder, Appellants argue that § 2151 shields blood centers and hospitals from liability, while leaving donors open to liability, and thus § 2151 violates the "special law" proscription of Art. V, § 46, also in violation of Art. II, § 7. We disagree.

In rejecting an equal protection challenge to the South Carolina "blood shield" statute, substantially similar to that of Oklahoma, the South Carolina Supreme Court noted:

> ... [O]f the 48 blood shield statutes enacted nationwide, not one has been ruled unconstitutional on Equal Protection grounds....

*Samson v. The Greenville Hospital System and the Carolina–Georgia Blood Center, Inc.,* 295 S.C. 359, 368 S.E.2d 665, 667 (1988).

Therein, and just as Appellants herein, Plaintiffs challenged the South Carolina statute as improperly favoring blood centers and other providers to the exclusion of donors. The South Carolina Supreme Court rejected this argument:

> [W]e discern [no] unequal treatment of potential defendants. Plaintiffs' assertion that commercial blood components manufacturers and paid donors remain exposed to suits for breach for implied warranties has no basis in the statute itself. [The statute] encompasses not only blood, but also "blood products or blood derivatives." Moreover, the statute does not distinguish paid donors from voluntary donors or commercial distributors from charitable distributors.

*Samson v. Greenville Hospital System,* 368 S.E.2d at 668–669.

Just as the South Carolina blood shield statute does not distinguish between different classes of blood suppliers, the Oklahoma statute similarly makes no distinction between different sources of blood products in the statutory immunity. Rather, § 2151 limits liability as to the "transaction" of the supply of blood and blood products, and hence, does not specially favor a class or classes of blood suppliers in the transaction.

In rejecting the identical "special law" argument attacking the Louisiana blood shield statute, the Fifth Circuit Court of Appeals reasoned:

> The plaintiff-appellants challenge ... [the blood shield statute's] state constitutionality. They contend [the Louisiana blood shield statute] violates the guarantee of due process, ..., and the prohibition against the legislative creation of an exclusive right or immunity.... The argument, in essence, is two-fold: that (1) the legislature may not, acting consistently with limitations imposed by the state constitution, eliminate causes of action already provided by the positive law announced by [state law], (2) for the benefit of a specific individual or organization.
>
> We are unable to accept this reasoning. For over 50 years, the Louisiana courts have recognized the validity of regulation of causes action, including replacement and even extinction, that one person may have against another for personal injuries. (Citation omitted.) The entire scheme of workmen's compensation is grounded on the acknowledgment of this power.....
>
> The [blood shield statute] is no less valid because it is explicitly directed at the suppliers of blood and blood components. [While] the Louisiana Constitution prohibits the granting of special immunity for "any corporation, association or individual," ... as long as a privilege or immunity "operates equally and fairly to those who engage in *like transactions* " and "affects alike all persons pursuing the same business under the same conditions, the Louisiana Constitution is satisfied. (Citations omitted.) ... Because the [blood shield statute] applies with such generality to those who provide the vital medical service of supplying blood and blood components—such as blood banks, hospitals and the like—it easily satisfies the well-established tests for constitutionality as a valid exercise of legislative authority.

*Heirs of Fruge v. Blood Services,* 506 F.2d 841, 848–849 (5th Cir.1975).

As the Sixth Circuit recognized, in upholding the Tennessee blood shield statute:

> The law in question involves all within the class of selling or distributing blood or plasma equally and treats this activity as a *medical service.* There appears to be no discrimination in the law favoring Hospital per se, because it is a hospital rendering important services. We will, therefore, recognize the provisions of [the Tennessee blood shield statute] in questions as being a constitutional exercise of authority for the public welfare by the Tennessee legislature.

*McDaniel v. Baptist Memorial Hospital,* 352 F.Supp. 690, 695 (W.D.Tenn.1972), aff'd. on appeal, *McDaniel v. Baptist Memorial Hospital,* 469 F.2d 230, 235 (6th Cir.1972).

Oklahoma law and constitutional analysis parallels this authority:

> In testing the validity of a state statute which differentiates in its treatment of one group of individuals compared with its treatment of another group as against the constitutional prohibition against taking property without due process of law, against denial of equal protection of the laws, and against the enactment of special as distinguished from general laws, a common test is applied, i.e., whether the classification which forms the basis for the differentiation is neither arbitrary nor capricious, and bears a reasonable relation to the object to be accomplished.

*Texas Oklahoma Exp. v. Sorenson,* 652 P.2d 285, 289–290 (Okl.1982).

Because the Oklahoma blood shield statute treats all within the "transaction" of supplying blood and/or blood products equally and without discrimination, and affords all within the "transaction" a qualified immunity, i.e., immunity from liability in the absence of negligence, we hold that § 2151 does not violate the "special law" prohibition of Art. V, § 46, nor the due process protection of Art. II, § 7. We recognize the provision of an adequate blood and organ supply for transfusion and trans-

plantation as a matter of overriding public concern, and we hold that the grant of immunity to those within the transaction of supplying blood for transfusion bears a reasonable relation to the public interest in the maintenance of an adequate blood supply for transfusion needs. Section 2151 is neither arbitrary nor capricious in attaining this object, and amounts to a constitutional exercise of the authority vested in the Oklahoma Legislature in the interest of the welfare of the citizens of this state to insure an adequate blood and organ supply. We therefore reject Appellants' constitutional challenges.

## II. APPELLANTS' CLAIMS AGAINST INSTITUTE

■ We next address Appellants' assertion that material fact questions concerning Appellee Institute's alleged breach of duty and/or negligence remained controverted, precluding summary judgment. We do not so view the evidence. The only evidence adduced on summary judgment showed adherence by Institute to all Federal and/or other authority regulations in the testing and screening of donors and blood product. Appellants assert that the admission by Institute's director, Dr. G., that two surrogate tests were not performed, presented a material issue of fact as to Institute's duty and breach thereof, mandating that summary judgment be denied.

We find this argument, unsupported by evidence of any kind showing a breach of duty or causation of damages by Institute arising from its failure to perform the advocated tests, unpersuasive. In rejecting the identical argument by Appellants therein, the District Court of the District of Columbia observed:

> Plaintiffs argue [against blood bank] that it was negligent for the [blood bank] to fail to use surrogate laboratory tests to eliminate contaminated blood from the blood supply.... Plaintiffs argue that AIDS and hepatitis were closely linked, ... [and] therefore suggest that [blood bank] should have implemented what is

known as the Hepatitis B core antibody test....

Plaintiffs are in error for two reasons. First, Plaintiffs can point to no organization, governmental or medical, which advocated the use of the [Hepatitis B core antibody test] as a means of screening blood for AIDS. Instead, Plaintiffs offer the testimony of two experts whose current opinion is that hospitals and blood banks should have used the core antibody test.... *These two individuals' opinions cannot alone create a standard of care or a prima facie case of negligence, where they are entirely in opposition to the standard prevailing at every hospital blood bank in the nation.* To permit these hindsight opinions to preclude summary judgment would violate the United States Supreme Court's mandate that Rule 56 be construed with due regard to defendants who have shown by competent evidence that a plaintiff's claims have no factual basis. *Celotex Corp. v. Catrett,* [477 U.S. 317, 327] 106 S.Ct. 2548, 2555 [91 L.Ed.2d 265] (1986). Thus, ... plaintiffs cannot establish a standard of care regarding surrogate tests from which the [defendant blood bank] departed.

. . . . .

The second insurmountable hurdle in plaintiffs' negligence case against the [blood bank] is that the Hepatitis B core antibody test, which plaintiffs' experts advocate, would have proven inutile in screening out the donor whose contaminated blood [plaintiff's decedent] received. That donor would have tested negative of hepatitis-B at the time of his donation. (Citation omitted.) Thus, the critical element of causation, wherein plaintiffs must show that the [blood bank's] failure to implement this test caused [plaintiff's decedent] to become infected, is absent. For this second reason, the [blood bank] is entitled to summary judgment as to plaintiff's negligence count.

*Kozup v. Georgetown University, et al.,* 663 F.Supp. 1048, 1057, 1058 (D DC1988).

In the present case, Appellants offered no evidence of any kind, beyond the mere argument, that Institute breached its standard of care by failure to implement tests which, by the only evidence adduced, were shown to be of no value. Appellants' attempt to cure the deficiencies in their proof on Motion to Vacate/reconsider came far too late to revitalize their case after the grant of summary judgment to Institute. 12 O.S.1981 § 991; Rule 13(d), Rules of the District Court, 12 O.S., Ch. 2, App.; *Lucas v. Hockett,* 469 P.2d 237 (Okl.1970). In short, Appellants failed to present any evidence of any kind which would justify a trial of the issues of Institute's negligence, and we therefore hold that the Trial Court properly granted summary judgment to Institute.

■ As to Appellants' challenge to the construction of § 2151, we find Appellants' argument without merit. Appellants hereunder assert that the Trial Court erred in finding the Appellants' claims for breach of implied warranty barred by § 2151. Appellants contend that their claims for breach of warranty remain viable if negligence is found. *Gilmore v. St. Anthony Hospital,* 516 P.2d at 251. With this contention, we agree. However, in the present case, as the Trial Court determined, and with which conclusion we agree, Appellants failed to make a prima facie case of negligence, in the absence of which, under § 2151, Appellants' claims under strict liability and breach of implied warranty theories must fail:

... *[A] cause of action making [a blood supplier] strictly liable* [i.e., liable without negligence] *for injuries from defects in the blood it furnishes, is barred,* or unauthorized, *by statute.*

... [O]nly in cases where the defendant has negligently failed to perform [his] duty or negligently breached such implied contract, that he will be liable for the consequences thereof. If the breach of warranty has occurred without negligence on [the defendant's] part, then, by

statute, plaintiff has no cause of action;
. . . .

*Gilmore,* 516 P.2d at 251.

Therefore, Appellants' claim under strict liability theory is barred by statute, and the Trial Court did not err. Because Appellants failed to make a prima facie case of negligence, their claim under breach of warranty theory must likewise fail. *Gilmore.* We therefore find the Trial Court properly granted summary judgment to Appellee Institute.

### III. APPELLANT'S CLAIMS AGAINST HOSPITAL

■ As we previously noted, Appellants raised a new issue, i.e., lack of informed consent, for the first time in the proceedings in their objections to summary judgment. While we have found no Oklahoma authority discussing the effect of an "eleventh hour" interjection of new matter, authority construing F.R.C.P. Rule 56 governing summary judgments recognizes that "affidavits going beyond the pleadings may be considered if facts appear in the affidavits which would justify an amendment." 6 Moore's Federal Practice, ¶ 56.11[3], p. 56–132; see also, *Sweeney v. Athens Regional Med. Ctr.,* 705 F.Supp. 1556 (M.D.Ga.1989); *Kane v. Chrysler Corp.,* 80 F.Supp. 360 (Del.1948). As Professor Moore elsewhere observes, "Affidavits that measure up to the requirements of Rule 56(e) may pierce pleading allegations and may raise issues that go beyond the pleadings where an amendment of a pleading to raise those issues would be warranted." 6 *Moore's,* Part 2, ¶ 56.22[1], p. 56–736.

Further, and as regarding amendment of pleadings, Professor Moore notes that under F.R.C.P. Rule 15 governing amendment, amendments "may change the theory of recovery or the relief sought." 3 *Moore's,* ¶ 15.08[2], p. 15–54. Federal Rule 15 is nearly identical to 12 O.S.Supp.1984 § 2015 which mandates that leave to amend must be freely granted in the interests of justice. In that vein, Professor Moore states with regard to amendment to interject new matter on summary judgment:

[I]f the amendment adds a new theory for relief, the pending motion for summary judgment is not defeated if the trial court does not subject the added claim to the pending motion. If the new theory of relief is not subjected to the pending motion for summary judgment, the court should either deny the motion, or if appropriate, enter a partial summary judgment based on the original theory of relief. On the other hand, if the new theory of recovery is made subject to the pending motion for summary judgment, the motion should be defeated, unless the parties are given sufficient opportunity to present matter directed to the issue of summary judgment as to the new claim. .

6 *Moore's,* ¶ 56.10, pp. 56–96, 56–97.

In the present case, the Trial Court's order granting summary judgment to Appellees makes no reference to the new issue of lack of informed consent on summary judgment, but the Trial Court clearly rejected Appellants' assertion of this new issue on Appellants' subsequent motion to reconsider. Under the authority cited above, we therefore find the issue of informed consent properly asserted and the Trial Court's ruling thereon ripe for review.

■ In that regard, Oklahoma law recognizes the duty of a *physician* to adequately inform his patients of known material risks of a particular procedure, in order that the patient may make an informed decision whether to consent to or reject the physician's proposed procedure or treatment. *Spencer v. Seikel,* 742 P.2d 1126 (Okl.1987); *Smith v. Karen S. Reisig, M.D., Inc.,* 686 P.2d 285 (Okl.1984); *Masquat v. Maguire,* 638 P.2d 1105 (Okl.1981); *Scott v. Bradford,* 606 P.2d 554 (Okl.1979); *Lambert v. Park,* 597 F.2d 236 (10th Cir. 1979); *Martin v. Stratton,* 515 P.2d 1366 (Okl.1973). In order to support a cause of action based on lack of informed consent, there must be shown (1) plaintiff's consent without complete revelation of attendant risks, (2) that plaintiff would not have consented to the treatment in the presence of

complete information, (3) that the unrevealed risk did in fact materialize, and (4) that plaintiff suffered injury as a result of subjection to the particular treatment or procedure. *Spencer*, 742 P.2d at 1129; *Smith*, 686 P.2d at 288; *Masquat*, 638 P.2d at 1106; *Scott*, 606 P.2d at 558; *Martin*, 515 P.2d at 1368–1369. However, a physician has no duty to inform a patient of risks known by the patient. *Spencer*, 742 P.2d at 1129; *Scott*, 606 P.2d at 558; *Martin*, 515 P.2d at 1368.

■ However, we find no Oklahoma authority imposing a like duty on *hospitals* to inform patients of potential risks and/or available alternatives to a particular procedure or treatment. Our review of the authority cited by the parties hereto from other jurisdictions reveals a consistent rejection of imposition of the duty to inform on hospitals, even in the presence of a statutorily mandated duty to inform. See, e.g., *Howell v. Spokane & Inland Emp. Blood Bank*, 114 Wash.2d 42, 785 P.2d 815 (1990); *Alexander v. Gonser*, 42 Wash. App. 234, 711 P.2d 347 (1985); *Pauscher v. Iowa Methodist Med. Ctr.*, 408 N.W.2d 355 (Iowa 1987); *Valcin v. Public Health Trust*, 473 So.2d 1297 (Fla.App.1984), approved in part, quashed in part, 507 S.2d 596 (Fla.1987); *Nevauex v. Park Place Hospital, Inc.*, 656 S.W.2d 923 (Tex.App. 1983); *Cox v. Haworth*, 54 N.C.App. 328, 283 S.E.2d 392 (1981); *Cooper v. Curry*, 92 N.M. 417, 589 P.2d 201 (App.1978), writ quashed 92 N.M. 353, 588 P.2d 554 (1978); *Kershaw v. Reichert*, 445 N.W.2d 16 (N.D. 1989); *Krane v. St. Anthony Hospital Systems*, 738 P.2d 75 (Colo.App.1987); *Lincoln v. Gupta, et al.*, 142 Mich.App. 615, 370 N.W.2d 312 (1985); *Cross v. Trapp*, 170 W.Va. 459, 294 S.E.2d 446 (1982); *Pickle v. Curns*, 106 Ill.App.3d 734, 62 Ill.Dec. 79, 435 N.E.2d 877 (1982).

Like these jurisdictions, we now refuse to impose upon hospitals the duty to inform patients of the material risks of a procedure prescribed by the patient's physician. To impose upon a hospital the duty to inform would be to require a hospital to intervene into the physician/patient relationship, "more disruptive than beneficial to [the] patient." *Howell*, 785 P.2d at 882; *Alexander*, 711 P.2d at 351. In short, we believe it to be the duty of the physician ordering blood transfusions, rather than the hospital filling the physician's orders, "to inform patients of the risks, general and specific, involved in the surgical procedures." *Howell*.

We therefore hold, under the facts and circumstances of this case, that Appellants' claim of lack of informed consent will not lie against Hospital under existing Oklahoma law. Even assuming *arguendo* that we should recognize such a duty of Hospital, clearly Hospital would not be required to inform Mr. Goss of a risk known to him. *Spencer*, 742 P.2d at 1129; *Scott*, 606 P.2d at 558; *Martin*, 515 P.2d at 1368. Mr. Goss' deposition testimony revealed that Mr. Goss knew of the risks of transfusion transmitted disease before he underwent surgery, clearly fatal to his claim of lack of informed consent. Further, we find no allegation or admissible evidence that Mr. Goss would have foregone the prescribed treatment if he had been informed of the specific risk of contraction of AIDS from any necessary blood transfusion, also fatal to his claim under extant Oklahoma law. *Spencer*, 742 P.2d at 1129; *Smith*, 686 P.2d at 289; *Masquat*, 638 P.2d at 1106; *Scott*, 606 P.2d at 558. We therefore find no error in the Trial Court's order granting summary judgment to Hospital on the issue of lack of informed consent.

The orders of the Trial Court granting summary judgment to Institute and Hospital are therefore AFFIRMED.

DONE BY ORDER OF THE COURT OF APPEALS IN CONFERENCE this 18th day of May, 1990.

BAILEY and MacGUIGAN, JJ., concur.