Teresa Gail Wells, the plaintiff in a medical-malpractice action, appeals from a summary judgment entered in favor of Drs. Robert Storey and Timothy Corbin; Huntsville Hospital; and nurses Donna Freedman Groce and Sharon Arnold; and she also appeals from a partial summary judgment entered in favor of Dr. Jess Power. We affirm.
On September 19, 1994, Wells was admitted to Huntsville Hospital. Wells contends that she was admitted for the induction of labor, while the defendants here on appeal assert that Wells was in the early stages of labor. Wells's prenatal care had been managed by the Family Practice Department of the University of Alabama in Huntsville ("UAH"). Wells was admitted by Donna Groce, a nurse employed by Huntsville Hospital. Nurse Groce obtained Wells's signature on an "Authorization for Procedure" form. At approximately 6:00 a.m. on September 20, 1994, Dr. Corbin, a resident physician employed by the UAH family-practice program, determined that Wells was in active labor, and he sent her to the delivery room. Nurse Arnold, the labor and delivery nurse who initially assisted Dr. Corbin, telephoned Dr. Power, the hospital's on-duty anesthesiologist, and reported to him that Wells was requesting an epidural anesthetic for labor pain.[1]
Dr. Power then administered the epidural anesthetic to Wells. After administering the epidural, Dr. Power rotated off call and left the hospital. He did not see Wells as a patient again.
Nurse Arnold and Dr. Corbin, with the help of Dr. Storey, an attending physician employed by the UAH family-practice program, delivered Wells's child, her third, a healthy baby boy. After doing a post-delivery checkup, which included an examination *Page 1036 
of the spinal region where the epidural anesthetic had been inserted, Dr. Corbin discharged Wells from the hospital on the afternoon of September 22, 1994.
Wells returned to the hospital in an ambulance on September 23, 1994. She complained of back pain and pain in her right leg with numbness and tingling, and she had a fever of 99.8 degrees. The emergency-room physician noted that she was three days postpartum, that an epidural had been administered, and that she had a history of lumbar-disc rupture. The emergency room diagnosis was "lumbar radiculapathy; s/p epidural block; and morbid obesity." Wells was discharged without treatment. The discharge instructions were bed rest, gentle heat, and weight loss.
On September 26, 1994, Wells again returned to the hospital by ambulance, complaining of severe back pain and paralysis. Dr. Joel Pickett, a neurologist, examined Wells. He found and drained an epidural abscess from the lumbar area of the spinal cord.[2] Wells suffered irrevocable nerve damage from the abscess, and the result was permanent paralysis from the waist down.
Thereafter, Wells filed a medical-malpractice action against the aforementioned hospital, physicians, and nurses. Wells alleged that her physicians had violated the medical standard of care each owed to her as a patient. She also alleged that, aside from the physicians' duty to obtain her informed consent to the epidural procedure, the hospital and the two nurses also had a duty to obtain her informed consent and that those defendants had breached that duty.
Each defendant moved for a summary judgment. Following a hearing, the trial court entered three summary judgments: (1) for the hospital and the nurses, on the ground that they had had no independent duty to obtain informed consent from Wells before she underwent a medical procedure; (2) for Drs. Storey and Corbin on the grounds that they were immune from suit, on the basis that at the time of the actions made the basis of Wells's claims they were employees of the UAH Family Practice Residency Program and were engaging in discretionary functions; and (3) for Dr. Power on all claims other than the claim regarding his alleged failure to obtain informed consent. Each of the three summary judgments was certified as final, pursuant to Rule 54(b), Ala.R.Civ.P.
 I.
Wells contends that the trial court erred in entering the summary judgment in favor of Huntsville Hospital and nurses Groce and Arnold against her claim that they had breached the appropriate standard of care by failing to obtain her informed consent.
Our review of a summary judgment is de novo.
 "In reviewing the disposition of a motion for summary judgment, `we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,' Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988), and whether the movant was `entitled to a judgment as a matter of law,' Wright v. Wright, 654 So.2d 542 (Ala. 1995); Rule 56(c), Ala.R.Civ.P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such *Page 1037 
an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Evidence is `substantial' if it is of `such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' Wright, 654 So.2d at 543 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala. 1993); Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413
(Ala. 1990)."
Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala. 1997).
Wells's admitting nurse was Donna Groce. As part of the admission process, Groce obtained Wells's signature on a form entitled "Huntsville Hospital Authorization for Procedure." This form stated, in pertinent part:
 "I, the undersigned hereby authorize Dr. _______________ and any designated assistants, to perform the following procedure(s) Vaginal Delivery Epidural Anesthesia and any such additional procedure(s) as are considered necessary on the basis of findings during the course of said procedure(s). I also consent to the administration of local anesthetics as necessary. This Authorization for Procedure and the possible alternative modes of treatment have been explained to me by my physician. The risks, dangers and possible complications of the procedure(s) have been carefully, fully and satisfactorily explained to me by my physician, and no guarantee or assurance has been made as to the results that may be obtained."
(Groce deposition, plaintiff's exhibit 1.)
During her deposition, Groce testified that the phrases "Vaginal Delivery" and "Epidural Anesthesia" were stamped onto the form before Wells signed it. Wells, however, disputed Groce's testimony, claiming that there was nothing stamped on the form when she signed it. Wells also testified that neither Nurse Groce nor Nurse Arnold, who assisted with the delivery, explained to Wells the risks associated with epidural anesthesia. Wells argues that this Court should create an independent duty that would require a hospital and its nurses to obtain informed consent from a patient for a medical procedure before a physician performs the procedure. We disagree.
Section 6-5-484, Ala. Code 1975, sets out the standard of care owed to a patient:
 "(a) In performing professional services for a patient, a physician's, surgeon's, or dentists's duty to the patient shall be to exercise such reasonable care, diligence and skill as physicians, surgeons, and dentists in the same general neighborhood, and in the same general line of practice, ordinarily have and exercise in a like case. In the case of a hospital rendering services to a patient, the hospital must use that degree of care, skill, and diligence used by hospitals generally in the community.
 "(b) Neither a physician, a surgeon, a dentist nor a hospital shall be considered an insurer of the successful issue of treatment or service."
In Fain v. Smith, 479 So.2d 1150, 1152 (Ala. 1985), this Court recognized a duty on the part of a physician to inform his patient of all material risks associated with a medical procedure, noting that a physician may be held liable if he negligently performs that duty. This Court stated, "We *Page 1038 
think the legislature has adopted the traditional view that the doctor's duty to get the informed consent of the patient must be measured by a professional medical standard." Id.
Although the question whether nurses and hospitals have an independent duty to obtain the informed consent of a patient is a question of first impression in this state, approximately one-half of the states have addressed this issue. In those states, the courts have uniformly held that the duty to obtain a patient's informed consent rests solely with the patient's physician, rather than with a hospital or its nurses (unless, because of special circumstances, the physician is an agent for the hospital). Kranev. Saint Anthony Hosp. Systems, 738 P.2d 75, 77 (Colo.App. 1987);Petriello v. Kalman, 215 Conn. 377, 576 A.2d 474, 477 (1990);Valcin v. Public Health Trust of Dade County, 473 So.2d 1297,1307 (Fla.Dist.Ct.App. 1984), rev'd in part on other grounds,507 So.2d 596 (Fla. 1987); Parr v. Palmyra Park Hosp., Inc.,139 Ga. App. 457, 228 S.E.2d 596, 598 (1976); Winters v. Podzamsky,252 Ill. App.3d 821, 621 N.E.2d 72, 75 (1993); Auler v. VanNatta, 686 N.E.2d 172, 175 (Ind.Ct.App. 1997); Pauscher v. IowaMethodist Medical Center, 408 N.W.2d 355, 362 (Iowa 1987); Kelleyv. Kitahama, 675 So.2d 1181, 1183 (La.Ct.App. 1996); Lincoln v.Gupta, 142 Mich. App. 615, 370 N.W.2d 312, 318 (1985); Ackerman v.Lerwick, 676 S.W.2d 318, 320-21 (Mo.Ct.App. 1984); Giese v.Stice, 252 Neb. 913, 567 N.W.2d 156, 164 (1997); Baird v. MedicalOptics, 301 N.J. Super. 7, 693 A.2d 904 (1997); Johnson v. Sears,Roebuck Co., 113 N.M. 736, 832 P.2d 797 (1992); Nisenholtz v.Mount Sinai Hosp., 126 Misc.2d 658, 483 N.Y.S.2d 568 (Sup.Ct. 1984); Cox v. Haworth, 54 N.C. App. 328, 283 S.E.2d 392, 395-96
(1981); Kershaw v. Reichert, 445 N.W.2d 16, 17-18 (N.D. 1989);Goss v. Oklahoma Blood Inst., 856 P.2d 998, 1007 (Okla.Ct.App. 1990); Kelly v. Methodist Hosp., 444 Pa. Super. 427, 664 A.2d 148,150-51 (1995); Boney v. Mother Frances Hosp., 880 S.W.2d 140, 143
(Tex.Ct.App. 1994); Howell v. Spokane Inland Empire BloodBank, 114 Wn.2d 42, 785 P.2d 815, 822 (1990); Cross v. Trapp,170 W. Va. 459, 294 S.E.2d 446, 458-59 (1982); Mathias v. St.Catherine's Hosp., Inc., 212 Wis.2d 540, 569 N.W.2d 330, 333
(Ct.App. 1997).
The rationale behind the uniformly held rule is explained by the New Mexico Court of Appeals in Johnson v. Sears, Roebuck Co.:
 "Although a hospital employee has the necessary skill and expertise to perform a procedure for which the employee has been trained, the employee does not necessarily have the requisite knowledge of a particular patient's medical history, diagnosis, or other circumstances which would enable the employee to fully disclose all pertinent information to the patient. See SCRA 1986, 13-1104B (Rep. 1991) (the standard to determine whether a patient was reasonably informed before he or she gave consent is measured by what reasonably well-qualified doctors under similar circumstances would have disclosed to a similarly situated patient). Without such knowledge, an employee's explanation of the risks and benefits of a procedure could be incomplete and might emphasize the risks inherent in any procedure without adequately describing the benefits and the specific reasons for which the physician ordered the procedure. See Parr v. Palmyra Park Hosp., Inc., 139 Ga. App. 457, 228 S.E.2d 596, 598 (1976). The physician is uniquely qualified through education and training, and as a result of his or her relationship to the patient, to determine the information that the particular patient should have *Page 1039 
in order to give an informed consent. See Kershaw v. Reichert, 445 N.W.2d 16, 17 (N.D. 1989)."
113 N.M. at 738, 832 P.2d at 799.
Further reasoning can be found in the Colorado Court of Appeals' opinion in Krane v. Saint Anthony Hospital Systems:
 "The reason for imposing this duty on the physician is to protect a patient's right to be informed of the risks of surgery prior to giving his consent. See Niblack v. [United States], 438 F. Supp. 383 (D. Colo. 1977); In re Swine Flu Immunization Products Liability Litigation, 533 F. Supp. 567
(D. Colo. 1980). It is the surgeon, and not the hospital, who has the technical knowledge and training necessary to advise each patient of the risks of the surgery prior to the patient giving his consent. Further, the hospital does not know the patient's medical history, nor the details of the particular surgery to be performed. Thus, we hold that a hospital does not generally have a duty to advise the patient prior to surgery as to the surgical procedure to be employed and the risks involved and, therefore, has no duty to obtain an informed consent similar to that which the surgeon is obligated to obtain. See Fiorentino v. Wenger, 19 N.Y.2d 407 227 N.E.2d 296, 280 N.Y.S.2d 373 (1967); Cooper v. Curry, 92 N.M. 417, 589 P.2d 201 (1978); Alexander v. Gonser, 42 Wn. App. 234, 711 P.2d 347 (1985)."
738 P.2d at 77.
As this Court stated in Fain v. Smith, 479 So.2d at 1152, the Alabama Legislature has adopted the traditional view that it is the doctor's duty to obtain the informed consent of the patient. Thus, we decline to create an independent duty that requires hospitals and nurses to likewise obtain informed consent from a patient. Accordingly, the summary judgment in favor of Huntsville Hospital and Groce and Arnold is affirmed insofar as it relates to Wells's claim that they had a duty to obtain her informed consent.
 II.
Wells next contends that the trial court erred when it entered the partial summary judgment in favor of Dr. Jess Power. Specifically, she argues that the summary judgment was improper insofar as it related to her claim that Dr. Power breached a duty to provide follow-up care. She argues that the appropriate standard of care requires a post-anesthesia follow-up by the anesthesiologist who performed the procedure.[3]
Entering the summary judgment for Dr. Power, the trial judge stated, in pertinent part:
 "Paragraph 16(e) of plaintiff's Fourth Amended Complaint alleges that Dr. Power, among others, was guilty of breach of the standard of care, and was negligent and wanton, `in failing to disclose the risks to her of the symptoms displayed on September 21, 1994, September 22, 1994 and September 23, 1994, and her potential need for urgent treatment.' [Emphasis supplied in the summary-judgment order.]
 "This allegation is lodged as against all defendants. To the extent that it asserts a claim against Dr. Power for *Page 1040 
some failure of disclosure in his discussions with the plaintiff on September 20, 1994 (the only time he saw her), it would be included in and subsumed by the informed consent count. On its face, however, this allegation would plainly appear to address the conduct of physicians other than Dr. Power who saw and examined the plaintiff on the dates enumerated, September 21, 22, and 23. The evidence in the case is undisputed that Dr. Power administered this epidural to the plaintiff between 6:30 a.m. and 7:00 a.m. on September 20, 1994. See Power dep. p. 9; pp. 19-21. He was with her approximately 30 minutes. The evidence is undisputed that Dr. Power did not see the patient at any time thereafter, and was not called to see the patient or notified in any respect thereafter. He was not consulted about her care thereafter. These particular allegations, with regard to diagnosis of symptoms and disclosure of risks of symptoms which may have been displayed by the patient on September 21, 22, and 23, address those physicians who saw the patient on those days. . . . There being no fact testimony whatsoever that Dr. Power saw the plaintiff on September 21, 22, or 23, or that he personally had a legal duty to see the patient on any of those dates, partial summary judgment is granted as to Dr. Power with regard to paragraph 16(e) of the plaintiff's Fourth Amended Complaint. It is specifically noted that the plaintiff's expert, Dr. Gloersen, did not testify that the standard of care for anesthesiologists would have required Dr. Power to see the patient on any of the dates referenced in this count. See, e.g., Gloersen dep. pp. 129-132. The testimony in the record is undisputed that Dr. Power went off duty at 7:00 a.m. on September 20, shortly after administering this epidural, while the plaintiff was still in labor. He turned the care of this patient over to the next anesthesiologist on call, and to the patient's attending physicians. See, Power dep. pp 57-59. The testimony in the record is undisputed that Dr. Power went off duty with the expectation that those following him on call, CRNAs or anesthesiologists, would perform the subsequent exam. See, Power dep. pp. 57-59. The plaintiff's expert, Dr. Gloersen, testified that his practice is the same. He did not offer the requisite testimony that there was a legal duty on the part of Dr. Power to return to the hospital on succeeding days to make such an examination, nor a breach of that duty that would constitute malpractice. See, Gloersen dep. pp 129-132. Further, there is no testimony in the record from the plaintiff's expert that any act or omission on the part of Dr. Power (or any other defendant) in this regard probably caused the plaintiff's injuries. To avoid summary judgment, the plaintiff must come forward with expert testimony that the specifically alleged negligence probably caused the injury. Smith v. Medical Center East, 585 So.2d 1325 (Ala. 1991); Sasser v. Connery, 565 So.2d 50 (Ala. 1990)."
(C. 780-82.)
On a motion for summary judgment, the burden is on the moving party to make a prima facie showing that there is no genuine issue of material fact to be considered by the jury. When the moving party has made this prima facie showing, the burden shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact. Leonard v. Providence Hosp., 590 So.2d 906,907 (Ala. 1991). "[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." *Page 1041 West v. Founders Life Assurance Co. of Florida,547 So.2d 870, 871 (Ala. 1989). See § 6-5-542(5), Ala. Code 1975; Gonzalez v. Blue Cross/Blue Shield of Alabama,689 So.2d 812, 816 (Ala. 1997). Moreover, to defeat a properly supported motion for a summary judgment on a medical-malpractice claim, the nonmovant ordinarily must present testimony from a "similarly situated" medical expert. Levesque v. Regional Medical Ctr.,612 So.2d 445, 449 (Ala. 1993).
Dr. Power was a board-certified anesthesiologist. Wells's "similarly situated" medical expert was Dr. Peter Gloersen, also a board-certified anesthesiologist. However, Dr. Gloersen's deposition testimony supported Dr. Power's contention that he had no duty to personally perform a follow-up on Wells after administering the epidural anesthetic, so long as a follow-up was performed by someone else. Dr. Gloersen testified:
 "Q. [Defense counsel] Let me see if I can get it even more specific. You would agree with me that there is nothing [in] the standard of care in the national medical community . . . that compels the doctor who did the stick [administers the epidural] to be the doctor to do the follow-up?
 "A. [Dr. Gloersen] That's correct. As long as the follow-up is completed.
 "Q. Sure. And that would be the responsibility of whoever is assigned in the hospital that day to that unit?
"A. Yes.
 "Q. How long after delivery is it the practice of your group to have whoever is assigned to the unit to check on a patient who has had an epidural?
 "A. Typically we prefer that they have an evaluation within 48 hours, and certainly before discharge.
 "Q. And if, as is the case here, Dr. Power was not assigned to labor and delivery again, from the time that he did this epidural until Teresa Wells was discharged, then you wouldn't have any criticism of him for not having come in to do a follow-up visit?
 "A. If he assumed that that follow-up was to be handled by some other entity within the department.
"Q. Sure. By whoever was on.
"A. Then I would not.
 "Q. And I'll just ask you to assume that was his assumption, and that that was their practice, and that when he went off, that he was due to be off and that someone else would handle it.
"A. Okay.
 "Q. And you wouldn't have any criticism of him or say that's any breach of the standard of care, would you?
"A. Under that assumption, no."
(Gloersen deposition, pp. 129-30.)
Wells offered no expert testimony indicating that Dr. Power breached the applicable standard of care regarding follow-up treatment. Such testimony was required by § 6-5-484, Ala. Code 1975. Because there was no genuine issue as to any material fact, the trial court properly entered the partial summary judgment in favor of Dr. Power on the claim that he provided negligent follow-up care.
 III.
Wells further contends that the trial court erred in holding that Drs. Corbin and Storey, as employees of the UAH Family Practice Residency Program, were immune from suit because it found that at the time of the actions Wells complains of they were engaged in discretionary functions. Specifically, Wells argues that Drs. Corbin and Storey were not entitled to "discretionary-function immunity" because, she says, they had a nondiscretionary duty *Page 1042 
to obtain her informed consent before she was administered an epidural anesthetic.
Despite this Court's well-established precedent concerning the doctrine of discretionary-function immunity, Wells asks this Court to overrule its decisions in Harper v. Gremmel,703 So.2d 346 (Ala. 1997);[4] Smith v. King, 615 So.2d 69 (Ala. 1993);Smith v. Arnold, 564 So.2d 873 (Ala. 1990); and Barnes v. Dale,530 So.2d 770 (Ala. 1988), and to distinguish the discretionary-function immunity enjoyed by State-employed physicians from the immunity enjoyed by other State employees. Based on the facts of this case, Wells argues, Drs. Corbin and Storey should not have immunity from her lawsuit. She maintains that the duty owed her by Drs. Corbin and Storey was one of due care. Citing Phillips v. Thomas, 555 So.2d 81 (Ala. 1989), she argues that the duty to obtain her informed consent "was not [a duty] requiring difficult decision-making like the duty accompanying a discretionary public function." In Ex parteCranman, [Ms. 1971903, November 24, 1999],* released today, this Court considered whether to abandon long-established precedent and to divest State-employed physicians of discretionary-function immunity. InCranman, the Court traced the history of discretionary-function immunity in Alabama and analyzed the constitutional implications of our prior case law, before stating:
 "We today review, refine, and restate the standards by which we draw the line for purposes of striking the balance between the right-to-a-remedy clause [of § 13] and the immunity of § 14. We do so with guidance from our post-DeStafney cases set forth in the Appendix to this opinion and, indeed, we rely on them as the basis for a restatement of our law. We also rely on the doctrine of separation of powers in striking a balance between § 13 and § 14. We do so mindful of the prospect that hard and fast rules are not likely to be effective, as circumstances not contemplated here will require further restatement and refinement. *Page 1043 
 "Except where the Constitution or laws of the United States or the Constitution, laws, regulations, or rules of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or where the governmental agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law, a governmental agent is immune from civil liability where the conduct made the basis of the claim against the agent is based upon the agent's formulation of plans, policies, or designs, or where the agent otherwise makes decisions such as those made in the context of the following activities:
"(1) making administrative adjudications;
"(2) allocating resources;
"(3) negotiating contracts;
 "(4) hiring, firing, transferring, assigning, or supervising personnel;
 "(5) activities of law-enforcement or correctional officers in arresting, attempting to arrest, or releasing persons;
 "(6) all other instances where acts or decisions, including those concerning the safety, health, well-being, fitness, competence, development, or confinement of persons, cannot be challenged without imposing a burden arising from interference with a coequal branch of government that exceeds the benefit of the challenging party's right to a judicial remedy."
392 So.2d at 415. Based on these standards, this Court concluded that the defendant physicians were entitled to state-agent's immunity. Id.
In accordance with the standards announced in Ex parteCranman, Drs. Corbin and Storey are entitled to state-agent's immunity. Drs. Corbin and Storey were treating Wells as a patient of the UAH Family Practice Clinic, the employer of both physicians. Dr. Corbin, a family-practice resident physician, was under the supervision of Dr. Storey, a UAH family-practice attending physician. Given the facts of this case, we conclude that Drs. Corbin and Storey were not servants of Huntsville Hospital, but, rather, were acting in a manner consistent with their job responsibilities as employees of the UAH Family Practice Residency Program.
Alabama has elected to educate physicians by funding state medical schools. Certainly, this State has an interest in training and educating physicians to care for its citizens. Moreover, as we noted in Cranman, "the Legislature has conferred broad powers on the University of Alabama to take steps `necessary to or promotive of the ends of its creation.' § 16-47-2, Ala. Code 1975." As employees of the UAH Family Practice Residency Program, Drs. Corbin and Storey were participating in one aspect of the State's medical-training program. Their conduct consisted of making decisions concerning the proper medical treatment for a patient in active labor who was requesting relief from the pain associated with childbirth.
In accordance with subparagraph (6) of the standards enumerated in Cranman, 792 So.2d at 414, we conclude that Drs. Storey and Corbin are entitled to state-agent's immunity. Our decision is in accordance with previous decisions where we have held that State-employed physicians making health-care determinations were engaged in "discretionary functions." See, e.g., Smith v. Arnold, 564 So.2d at 876. But, as we stated inCranman, "that factor alone is not determinative." 392 So.2d at 414. Here, the balancing analysis weighs in favor of immunity by this State's decision to educate physicians and to fund medical schools and the legislative authority for the University of Alabama to engage in *Page 1044 
such activities. When State-employed physicians provide health-care services for the citizens of Alabama, they perform a public service. As we noted in Cranman:
 "The denial of state-agent's immunity for those performing these public responsibilities would increase the cost of providing higher education — in the form of the University's paying damages awards on behalf of the physicians, or in the form of the University's paying insurance premiums on behalf of the physicians, or in the form of the University's paying higher salaries to enable the physicians to purchase their own insurance or to compensate the physicians for their risk of liability. . . .
 "Thus, because it does not appear that the burden on [the plaintiff] significantly outweighs the societal benefits of applying state-agent's immunity to the state-employed defendant physicians, we conclude that the balance of the § 13 and § 14 policies, considered in light of § 43, favors the application of state-agent's immunity to the defendant physicians for activities undertaken in the performance of their University-related health-care responsibilities."
792 So.2d at 416-17.
Based on the authority of Ex parte Cranman, the summary judgment in favor of Drs. Corbin and Storey is affirmed.
AFFIRMED.
Houston, See, and Lyons, JJ., concur.
Maddox, J., concurs specially.
Johnstone, J., concurs in part and concurs in the result in part.
Hooper, C.J., and Cook, J., concur in part and dissent in part.
[1] Wells denied making such a request, and disputed the content and circumstances surrounding her conversation with Arnold and Dr. Power. Wells alleged that Dr. Power failed to obtain her informed consent to the epidural procedure, and she sought damages for that alleged failure. The fact that Wells denies requesting the epidural is related to that claim. That claim is the only one of the plaintiff's claims not disposed of by the summary judgment here on appeal.
[2] Dr. Pickett testified that hemorrhage from placement of the catheter for the epidural anesthetic was the most likely cause of the abscess.
[3] Although Dr. Power's summary judgment related to all of Wells's claims against Dr. Power except her claim that he failed to obtain her informed consent, the only contention Wells makes on appeal, as to Dr. Power, is that the trial court erred in entering the summary judgment against her claim that he breached the standard of care with respect to a follow-up visit. Thus, it is unnecessary to discuss the remaining claims on which the summary judgment was entered.
[4] In Harper, the majority affirmed the judgment of the trial court, without an opinion; however, in dissent, Justice Cook addressed the issue whether the defendant, a State-employed physician, was entitled to a summary judgment under the doctrine of discretionary-function immunity. Although the decision inHarper has no precedential value, see Rule 53(d), Ala.R.App.P., we note it because of Justice Cook's dissent in that case. In that dissent, he stated that the defendant Dr. Gremmel was not entitled to a summary judgment because, Justice Cook said, he was a "loaned servant" of the private hospital where he treated the plaintiff Harper. 703 So.2d at 347.
* Note from the reporter of decisions: Wells v. Storey and Exparte Cranman were both decided by opinions issued on November 24, 1999. The main opinion in Wells v. Storey and the special writings cite Cranman
several times. Rehearing applications were filed in both cases. The rehearing application in Wells was withdrawn on January 15, 200; the rehearing application in Cranman remained pending until June 16, 2000. On that date, the Supreme Court granted the application, withdrew the November 24, 1999, opinion, and substituted a new opinion. The November 24, 1999, opinion carried the judgment line "AFFIRMED." The opinion substituted on June 16, 2000, was very different; it carried the judgment line "[REHEARING] APPLICATION GRANTED; OPINION OF NOVEMBER 24, 1999, WITHDREW; OPINION SUBSTITUTED; REVERSED AND REMANDED."
The quotation from Cranman that appears later in this paragraph beginning "We today review, refine, and restate ..." does not appear in the June 16, 2000, Cranman opinion. Likewise, other statements quoted in Wells from Cranman may not appear in the substitutedCranman opinion of June 16, 2000
A second application for rehearing in Cranman was denied on November 22, 2000. The opinion in EX parte Cranman is published at 792 So.2d 392.