# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

AUBURN VALLEY INDUSTRIAL
CAPITAL LLC, a Delaware limited
liability company,

                Respondent,

           v.

ROSS B. HANSEN and JANE DOE
HANSEN, individually and their
marital community, d/b/a
NORTHWEST TERRITORIAL MINT;
NORTHWEST TERRITORIAL MINT,
LLC, a Washington limited liability
company,

                Appellants.

NO. 69568-1-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: July 14, 2014

LEACH, J. — Ross Hansen, d/b/a/ Northwest Territorial Mint, and Northwest Territorial Mint LLC (collectively NW Mint) appeal the trial court's findings of fact, conclusions of law, and judgment holding NW Mint liable for Auburn Valley Industrial Capital LLC's remedial action costs under the Model Toxics Control Act (MTCA), chapter 70.105D RCW, and for damages for breaching its commercial lease with Auburn. NW Mint also appeals the court's supplemental judgment and order awarding attorney fees and costs to Auburn. Substantial evidence supports the trial court's findings of fact, which support its conclusions that NW Mint breached the lease. Because NW Mint identifies no

costs recoverable under the MTCA that are not recoverable under the lease, we do not decide if the MTCA applies to this case. NW Mint fails to show that the trial court abused its discretion when it awarded costs and fees to Auburn. We affirm.

## FACTS

NW Mint is a full service mint that fabricates coins and other metallic items. In May 2002, Ross Hansen, d/b/a/ Northwest Territorial Mint, signed a six-year agreement with MegaWest LLC to lease suite 101 of a commercial-industrial property.[1] The building was new when this lease began, and Ross Hansen, d/b/a/ Northwest Territorial Mint, was the first tenant in suite 101. In July 2007, MegaWest sold the building and assigned its interest in the lease to Auburn. NW Mint occupied the premises and was a tenant under the lease from December 31, 2002, until April 30, 2010, when the lease ended.

Section 11 of the lease stated,

---

[1] In December 2002, Hansen formed Northwest Territorial Mint LLC, which was not a party to this lease agreement. The trial court concluded,

> Northwest Territorial Mint, LLC was acting as a Tenant under the Lease and as an operator of the mint business at the Auburn property from December 31, 2001 through the end of NW Mint's lease in April of 2010. NW Mint's operations at the Auburn property were held out to the public as operations of Northwest Territorial Mint, LLC. Northwest Territorial Mint, LLC succeeded to enough of Hansen's rights and obligations under the Lease to be considered a Tenant under the Lease. At a minimum, Northwest Territorial Mint, LLC occupied the leased premises as its principal place of business and made all of the monthly Lease payments to Auburn from 2007 until the end of the Lease.

The premises leased is located in an area zoned as M-1, which permits uses including "residential, daycare, preschools, nursery schools, health and fitness clubs, restaurants, and other uses."

HAZARDOUS WASTE. Tenant shall not store, generate, dispose of or otherwise allow the release of any hazardous waste or materials in, on or under the Premises, Property or Project or any adjacent property, or in any improvements placed on the Premises. Except as otherwise provided, Tenant represents and warrants to Landlord that Tenant's intended use of the Premises does not involve the use, production, disposal or bringing on to the Premises of any Hazardous Waste. As used herein, the term "Hazardous Waste" includes any substance, waste or material defined or designated as hazardous, toxic or dangerous (or any similar term) by any federal, state or local statute, regulation, rule or ordinance now or hereafter in effect, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, or the Washington Model Toxics Control Act ("MTCA"), RCW 70.105D.010 et seq. Tenant shall promptly comply with all statutes, regulations and ordinances, and with all orders, decrees or judgments of governmental authorities or courts having jurisdiction, relating to the use, collection, treatment, disposal, storage, control, removal or cleanup of Hazardous Waste in, on or under the Premises or any adjacent property, or incorporated in any improvements, at Tenant's expense. After notice to Tenant and a reasonable opportunity for Tenant to effect such, Landlord may, but is not obligated to, enter upon the Premises and take such actions and incur such costs and expenses to effect such compliance as it deems advisable to protect its interest in the Premises; provided, however, that Landlord shall not be obligated to give Tenant notice and an opportunity to effect such compliance if (i) such delay might result in material adverse damage to Landlord or the Property, (ii) Tenant has already had actual knowledge of the situation and a reasonable opportunity to effect such compliance, or (iii) an emergency exists. Whether or not Tenant has actual knowledge of the release of Hazardous Waste on the Premises or Property or any adjacent property as the result of Tenant's use of the Premises, Tenant shall reimburse Landlord for all costs and expenses incurred by Landlord in connection with such compliance activities. Tenant shall notify Landlord immediately of any release of any Hazardous Waste in, on, under or from the Premises, Property or Project. Tenant shall indemnify, defend and hold harmless Landlord against any and all losses, liabilities, suits, obligations, fines, damages, judgments, penalties, claims, charges, cleanup costs, remedial actions, costs and expenses (including, without limitation, consultant fees, attorneys' fees and disbursements) which may be imposed on, incurred or paid by, or asserted against Landlord or the Premises, Property or Project by reason of, or in connection with (i) any

misrepresentation, breach of warranty or other default by Tenant under this Lease, or (ii) the acts or omissions by Tenant under this Lease, or (iii) the acts or omissions of Tenant, or any sublessee or other person for whom Tenant would otherwise be liable, resulting in the release of any Hazardous Waste. This indemnity and Tenant's other duties under this paragraph 11 shall survive the termination of this Lease.

Section 13 of the lease stated,

Tenant will at all times during the Term keep the Premises and all systems therein and the doors and windows thereof neat, clean and in good order, repair and in a sanitary condition. . . . Except for reasonable wear and tear and damage by fire or unavoidable casualty, Tenant will at all times preserve the Premises in as good repair as they are now or may hereafter be put to. All repairs shall be at Tenant's sole cost and expense, except for repairs required for the outside roof, exterior walls and foundation which shall be Landlord's responsibility. Tenant will, at all times, cause the Premises to comply with all ordinances, regulations, rules or orders of every governmental entity undertaking jurisdiction over the Premises.

This provision also stated, "Tenant agrees that at the expiration or sooner termination of this Lease, Tenant will quit and surrender the Premises without notice, and in a neat and broom clean condition." The lease also contained the following attorney fee and cost provision:

If Landlord employs an attorney or if Landlord brings suit to recover any rent due hereunder, or for breach of any other provision of this Lease . . . , Landlord shall be awarded its attorney's fees, statutory court costs, and all other litigation costs and expenses expended or incurred in connection with such action and in any appellate or collection proceedings. All sums due from Tenant to Landlord shall bear interest at the Default Interest rate.

In June 2007, before purchasing the property, Auburn hired EBI Consulting to perform a phase I environmental site assessment of the building. A phase I environmental site assessment report informs a potential purchaser or lender if the property contains or likely contains any recognized environmental

-4-

conditions—any hazardous substances on a property under conditions that indicate an existing release, a past release, or a material threat of a release of any hazardous substances into structures on the property or into the ground, groundwater, or surface water of the property. Recognized environmental conditions include hazardous substances under conditions in compliance with laws but do not include de minimis conditions. Because a phase I environmental site assessment is a screening tool to determine if any recognized environmental conditions warrant additional investigation, it does not include any actual sampling. A phase I environmental site assessment also affords its user the ability to satisfy one of the requirements to qualify for the innocent landowner, contiguous property owner, or bona fide prospective purchaser limitations on liability under the federal Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601, as well as the MTCA. Federal standards govern these assessments.

EBI's phase I environmental site assessment report noted that NW Mint used the property to produce commemorative coins. NW Mint used machinery and equipment including presses, stamps, and saws, and it used a commercial-grade soap to polish the coins. EBI's report identified no evidence of recognized environmental conditions or evidence of leaks, staining, or obvious accumulations of metal dust.[2] EBI's assessment did not include interviews with

_____

[2] At trial, a representative from EBI testified, "And in the context of those concentrations being relatively high concentrations in our sampling, for example, we would be—that amount would be spread out over a square foot. So the

any individuals from NW Mint. It also did not include inspections of HV/AC, heating, ventilation, or air conditioning systems, or of roof areas. Auburn relied on EBI's phase I environmental site assessment when it purchased the property.[3]

In May 2010, after the lease ended, Auburn hired EBI to survey the entire condition of the premises. This survey included an industrial hygiene assessment to allow Auburn "to be sure that the property was safe for lease in an unrestricted manner to any particular type of tenant that they could attract to the property." EBI's survey did not include a human health risk assessment. If contamination levels in collected samples were below EBI's own surface contamination limits, EBI would certify the facility as clean and certify that a tenant could occupy the premises without restrictions or limitations.

In its "Site Cleanliness Investigation Report," EBI determined that based on its own surface contamination limits, the premises was "grossly contaminated with toxic metal dusts, fines, and process residuals."[4] EBI found, "All

---

ability to observe that is very limited." He also testified that EBI only later became aware that NW Mint conducted industrial processes on the premises, such as furnaces for melting metal, locations for pouring melted metal into molds, blasting operations, and electroplating.

[3] The trial court concluded that Auburn undertook all appropriate inquiry into the previous ownership and uses of the premises consistent with good commercial practice.

[4] In this report, EBI stated,

There are currently no regulatory limits addressing surface contamination for industrial type settings, so EBI has developed surface contamination limits based on regulatory daily intake and exposure limits. If the contaminant concentration is less than these developed surface limits, EBI is willing to confirm that the surfaces are clean and that the facility is clean/free of hazardous toxic contamination. However, all of the five (5) composite samples had sufficient contamination to indicate that the facility is contaminated

-6-

manufacturing areas greatly exceed the limits for silver, selenium, and copper. Additionally, at least one area exceeds the limit for each of the following toxic metals: Arsenic, cadmium, chromium, lead, cobalt, manganese, nickel and zinc." EBI concluded, "Inhalation of the toxic metal dusts or skin contact of settled dust could have significant harmful health effects." Further, "[a]ny settled dusts or metal fines would likely be listed or characterized as a regulated hazardous waste." EBI recommended that workers properly trained in exposure to hazardous substances clean the facility.

Before receiving EBI's report, Auburn did not believe that NW Mint released hazardous substances at the premises. Auburn shared the report with NW Mint and included a letter stating,

> Pursuant to, among others Sections . . . 11 ("Hazardous Waste"), 13 ("Maintenance and Repairs; Redelivery") . . . of the Lease, we are affording your client the opportunity under the Lease to take steps to remediate the contamination of the premises. Action needs to be taken to bring contaminant levels down to safe levels within the parameters of the specifications in the enclosed report.

EBI issued a "Lease Space Move Out Survey" in June 2010 after inspecting the physical condition of the premises. In its report, EBI noted that Hansen would not allow photographs of the building's interior and would not provide answers about his business or manufacturing processes. EBI was

---

with a number of toxic metals and should not be leased or occupied without further cleaning and decontamination.
At trial, a representative from EBI testified, "We used our approach, and if somebody had offered a scientifically based actual alternative to cleaning up the property, that we could have . . . had a dialogue on, we were more than happy to do that. That never happened."

unable to access the roof. EBI shared this survey with NW Mint and enclosed a letter stating, "EBI Consulting has concluded that Ross Hansen did not properly maintain the premises nor return the premises in good working condition as required under the terms of the Lease."

Auburn established a deadline of June 1, 2010, for NW Mint "to agree to assume full responsibility for clean-up of the premises to a condition meeting the terms of the lease and satisfactory to EBI Consulting, such that the landlord is in a position to safely market this space and to have that clean-up done immediately." NW Mint hired AMEC, an environmental consultant, to review EBI's report. Before allowing AMEC to inspect the property, Auburn initially insisted that NW Mint agree to responsibility for "whatever clean-up that is determined by the experts needs to be done." NW Mint declined. In response to NW Mint's renewed request to access the premises, Auburn wrote a letter stating,

> Because [Hansen] had been equivocal in prior communications regarding your client as liable for this contamination, we believed it would be an act of good faith on your client's part to acknowledge his responsibility for such contamination, and that doing so would facilitate better cooperation between the parties and a common purpose to addressing and remediating the contamination, especially given your client's lack of cooperation with the owner in the past.[5]

AMEC completed its review of EBI's report in June 2010. AMEC concluded, "It is the opinion of AMEC that the EBI's methodology and approach

---

[5] Auburn ultimately permitted industrial hygienist Elisabeth Black to access the premises and conduct sampling.

are flawed and cannot be relied upon to determine whether there is a potential health risk to occupants of the building." It noted, "AMEC has not established clean-up criteria for this facility at this time, but we would certainly use different methodology to do so." It also stated, "Further investigation is needed, and they may conclude that there are areas that need to be cleaned up."

In June 2010, industrial hygienist Elisabeth Black developed a proposal for NW Mint "to facilitate the removal of settled dust and metals." She expressed "no reason to believe that the EBI results weren't accurate." Black "took issue with, perhaps, their sampling method and clean-up criteria they established, but from my perspective, in counseling my client, it seemed like going to clean-up was likely the simplest option." NW Mint rejected Black's proposal.

In August 2010, Black presented NW Mint with a proposal to identify the levels of metals and surface dust on the premises. Auburn's expert, Stephen Frost, accompanied Black as she sampled the premises and took side-by-side samples.

In November 2010, Black issued a report concluding, based on a limited amount of information, that the premises posed a potential hazard. Black also stated in her report, "Whether or not this condition creates an adverse health impact to a future tenant of the building cannot be determined based on available information." She noted that the elevated samples were not attributable to background contamination from natural and human sources—these samples exceeded background levels. And she found that the metal concentrations and

types of metals were unusual.[6]  Black recommended that an "experienced

abatement firm with training in hazardous waste operations" conduct a "thorough

cleaning" "according to a protocol prepared by a certified industrial hygienist."

Auburn hired Clean Harbors to clean the premises.  EBI oversaw Clean

Harbors' remediation, which took place from January through October 2011.

Clean Harbors cleaned the premises according to EBI's contamination limits.

In October 2011, EBI issued to Auburn a certification letter confirming that

future tenants could use suite 101 without restrictions or limitations attributable to

hazardous metals.  In March 2012, EBI issued a "Facility Cleaning &

Decontamination Certification and Environmental Closure Report," which

documented the investigation and remediation work in suite 101.

In 2009, Auburn sued Hansen for breach of contract, seeking injunctive

relief and damages arising out of a dispute about access to an electrical room,

phone room, and common areas of the premises.  In 2010, Auburn sued NW

Mint, asserting breach of contract claims arising under the lease and a claim to

recover "remedial action costs" under RCW 70.105D.080.  Auburn claimed that

NW Mint breached the lease by contaminating the building with hazardous

---

[6] Black testified,
    [T]his is not a condition you would typically encounter, either in types of metals or concentrations of metals.  It is unusual because we rarely ever get metals and surface dust values for an industrial facility, it is type sampling that's fairly rare, unless it is directed at lead, for which there are standards; it is not typically done. Unusual, because I think, as I have said before, it puts the land owner or properties owner in a condition that was going to require some action to move forward and make that space leasable for unrestricted use.

substances, as defined by federal and state law, by damaging the building in excess of normal wear and tear, and by failing to remove tenant improvements. Auburn alleged over $1.3 million in damages. On February 11, 2011, the trial court consolidated these cases.

In January 2012, Auburn hired toxicology expert John Schell to conduct a human health risk assessment of the leased premises—a quantitative evaluation of risk.[7] Schell testified at trial that a "cleanup level" under the MTCA is a protective level that is safe for human health. He concluded that the levels of arsenic, chromium-VI, copper, and selenium exceeded the MTCA cleanup standards.[8] Schell testified that before Clean Harbors cleaned the premises, "Based on my calculations of a risk based cleanup level, some of those metals, the concentrations in the dust, posed a potential health threat."

In June 2012, NW Mint applied to the Washington State Department of Ecology's Voluntary Cleanup Program (VCP).[9] The Department of Ecology (Ecology) rejected NW Mint's application, reasoning,

> We did not accept your application because the release you reported does not constitute a hazardous waste site requiring remedial action under the Model Toxics Control Act (MTCA),

---

[7] Schell testified that "risk is a function of both the toxicity of the material and the dose that is received."

[8] Schell relied upon a bulk dust sample analysis that Stephen Frost conducted, which determined the concentrations of constituent metals. Schell noted that using the United States Environmental Protection Agency's calculation method, the levels of silver also exceeded the cleanup standard.

[9] The VCP supports independent cleanup actions. It allows owners and operators of contaminated sites to enter into an agreement with the Department of Ecology to review cleanup-related documents and to issue opinions about compliance with the MTCA.

Chapter 70.105D RCW. This opinion is based on an analysis of whether there has been a "release" into the "environment" of a "hazardous substance" as defined by MTCA, Chapter 70.105D RCW, and its implementing regulations, Chapter 173-340 WAC.

. . . .

Documents provided to Ecology state that areas within the building contain dust composed of silver, selenium, copper, arsenic, cadmium, chromium, lead, cobalt, manganese, nickel and zinc.

From the documents provided, metal dust did not enter the "environment". Rather, the dust was contained within the building.

This opinion is regarding the administrative and technical requirements of MTCA, and is not an opinion regarding whether other local, state or federal requirements may apply to the facility.

In July 2012, NW Mint filed a second application to the VCP. This application was not different materially from NW Mint's first application. Ecology rejected this application, reasoning,

We did not accept your application because the data provided to Ecology is insufficient to show a release into the environment of a hazardous substance. This decision is based on an analysis of whether there has been a "release" into the "environment" of a "hazardous substance" as defined by MTCA, Chapter 70.105D RCW, and its implementing regulations, Chapter 173-340 WAC. . . . Ecology makes no determination as to whether there is a threatened release of a hazardous substance. The VCP is not designed for review of remedial actions related solely to a threatened release.

. . . .

Documents provided to Ecology state that areas within the building contain dust composed of silver, selenium, copper, arsenic, cadmium, chromium, lead, cobalt, manganese, nickel and zinc (collectively "metals dust"). Ecology received no sampling data of surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air. If such data is provided, you may reapply to enter the VCP.

-12-

This decision is regarding whether Ecology will accept your application to enter the VCP. This decision is not an opinion regarding whether other local, state or federal requirements may apply to the facility. This decision does not determine whether any independent remedial action performed at the facility is the substantial equivalent of an Ecology-conducted or Ecology-supervised remedial action. Such determinations are made by a court. See RCW 70.105D.080. The state, Ecology and its officers and employees are immune from all liability, and no cause of action of any nature may arise from any act or omission in providing this informal advice and assistance. See RCW 70.105D.030(1)(i).

On October 15, 2012, the trial court entered 155 findings of fact, 31 conclusions of law. The court concluded that Hansen and Northwest Territorial Mint LLC were "strictly liable, jointly and severally, for all remedial action costs incurred by Auburn at the Auburn property." On November 14, 2012, the trial court entered an order granting in part and denying in part Auburn's motion to amend these findings of fact and conclusions of law and entered a judgment in favor of Auiburn.[10] In the judgment, the court awarded to Auburn $869,746.53 in remedial action costs under the MTCA and damages for NW Mint's breach of the lease. The court also awarded attorney fees and costs to Auburn under the MTCA and the lease.

On June 4, 2013, the trial court entered a supplemental judgment and order awarding $1,582,046.61 in costs and attorney fees to Auburn.

NW Mint appeals.

---

[10] The court removed legal fees from Auburn's remedial action costs, reducing the calculation from $657,818.68 to $391,573.23. NW Mint does not appeal this order.

-13-

## STANDARD OF REVIEW

We review challenged findings of fact by examining if substantial evidence supports the findings and if the findings in turn support the conclusions of law.[11] Substantial evidence exists if it is sufficient to persuade a fair-minded, rational person of the truth of the matter asserted.[12] Unchallenged findings of fact are verities on appeal.[13] A trial court's interpretation of contract language presents an issue of law that we review de novo.[14]

We review the legal basis for an attorney fee award de novo but review the reasonableness of the award amount for abuse of discretion.[15] A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds.[16]

## ANALYSIS

NW Mint raises three issues. First, it claims that it did not breach the parties' lease. Second, NW Mint contends that the MTCA does not apply to the premises at issue and that it did not violate this statute. Third, NW Mint asserts

---

[11] State v. Ross, 106 Wn. App. 876, 880, 26 P.3d 298 (2001) (citing State v. Dempsey, 88 Wn. App. 918, 921, 947 P.2d 265 (1997); State v. Hill, 123 Wn.2d 641, 647, 870 P.2d 313 (1994)).

[12] State v. Levy, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006) (citing State v. Mendez, 137 Wn.2d 208, 214, 970 P.2d 722 (1999)).

[13] Hill, 123 Wn.2d at 644.

[14] 224 Westlake, LLC v. Engstrom Props., LLC, 169 Wn. App. 700, 716, 281 P.3d 693 (2012) (citing Knipschield v. C-J Recreation, Inc., 74 Wn. App. 212, 215, 872 P.2d 1102 (1994)).

[15] W. Consultants, Inc. v. Davis, 177 Wn. App. 33, 38, 310 P.3d 824 (2013) (citing Hulbert v. Port of Everett, 159 Wn. App. 389, 407, 245 P.3d 779 (2011)).

[16] State v. Emery, 161 Wn. App. 172, 190, 253 P.3d 413 (2011) (quoting State v. Allen, 159 Wn.2d 1, 10, 147 P.3d 581 (2006)).

that the trial court abused its discretion when it awarded fees and costs to Auburn. We affirm NW Mint's liability under the lease and the court's attorney fee and cost award. As a result, we do not need to reach NW Mint's MTCA claim.[17]

NW Mint makes three challenges to its liability under the lease. First, NW Mint claims that "the residual metals NW Mint left at the Premises did not present a risk of actual harm to human health or the environment." Second, it alleges, "NW Mint complied with all statutes, regulations and orders concerning hazardous wastes." Third, NW Mint asserts, "NW Mint left the Premises in a 'broom clean' condition, which is the Lease's only cleanup standard." We reject these contentions.

The trial court found, "Section 13 of the Lease applies to the physical condition of Suite 101, and the 'broom clean' specification in Section 13 does not modify or supersede the requirements of Section 11 of the Lease regarding hazardous substances." It also found, "NW Mint did not cooperate with Auburn's investigation and cleanup of the contamination in 2010 and 2011." The court concluded, "NW Mint stored, generated, disposed, or otherwise released hazardous materials on the premises, in breach of Section 11 [of] the Lease." It also concluded, "NW Mint failed to notify Auburn of the release of hazardous

---

[17] Auburn contends that NW Mint's brief fails to comply with RAP 10.3. Because the nature of Auburn's challenges are clear, Auburn shows no prejudice from any alleged violation, and RAP 1.2 requires us to interpret these rules liberally to promote justice and facilitate the decision of cases on the merits, we waive any technical violations of RAP 10.3.

waste at the Auburn Property in breach of Section 11 of the Lease." Additionally, it concluded, "Auburn provided NW Mint notice and a reasonable opportunity to comply with measures that Auburn deemed advisable to protect its interest in the Auburn Property. NW Mint failed to undertake any appropriate or meaningful remedial action." NW Mint breached section 13 "by failing to maintain the premises in good order and repair at the time of surrender on April 30, 2010."

NW Mint claims, "Before the Lease terminated in 2010, Auburn never objected to NW Mint's use of metals such as silver, copper and nickel in its manufacturing processes. Auburn never claimed that NW Mint's operations breached Section 11 of the Lease." It asserts that the trial court "erred in concluding that the mere presence of metallic dust in the Premises constituted a breach of Section 11 of the Lease" because "Auburn did not introduce any evidence that the residual metallic dust, which was in the Premises at lawful, de minimus [sic] levels, presented a threat to human health or the environment."

The record shows that NW Mint "store[d], generate[d], dispose[d] of or otherwise allow[ed] the release of any hazardous waste released hazardous materials" on the premises and did not notify Auburn of these releases. The trial court found, "Hazardous substance metal fumes, dust and residues were dispersed throughout the facility and were also released to the 'environment,' as evidenced by high levels of hazardous substance metal dust/residue found outside of the building, both on the roof and on the loading dock area outside of the building."

Although NW Mint assigns error to the court's conclusion that "[t]he metal dust/residue, including arsenic, chromium, lead, selenium, silver, copper, nickel, and zinc, at the Auburn Property are hazardous substances as defined by MTCA/CERCLA," it does not support this assignment of error with any argument. If a party fails to support an assignment of error with legal arguments, we do not consider them on appeal.[18] The lease prohibited any storage, generation, disposal, or other releases of hazardous materials, regardless of whether the releases posed a risk to human health or the environment. NW Mint fails to establish its compliance with section 11 of the lease.

NW Mint also breached the lease because it did not maintain the premises in "neat, clean and in good order, repair and in a sanitary condition," as section 13 required. NW Mint rejected Auburn's requests to clean the premises to enable Auburn to relet it to a new tenant. Even if NW Mint "quit and surrender[ed] the Premises . . . in a neat and broom clean condition," these violations were sufficient to constitute a breach of both section 11 and section 13.

NW Mint also challenges its liability under the MTCA. RCW 70.105D.080 states,

> Except as provided in RCW 70.105D.040(4)(d) and (f), a person may bring a private right of action, including a claim for contribution or for declaratory relief, against any other person liable under RCW 70.105D.040 for the recovery of remedial action costs. In the action, natural resource damages paid to the state under this

---

[18] Howell v. Spokane & Inland Empire Blood Bank, 117 Wn.2d 619, 624, 818 P.2d 1056 (1991) (citing Schmidt v. Cornerstone Invs., Inc., 115 Wn.2d 148, 795 P.2d 1143 (1990); Howell v. Spokane & Inland Empire Blood Bank, 114 Wn.2d 42, 46, 785 P.2d 815 (1990)).

chapter may also be recovered. Recovery shall be based on such equitable factors as the court determines are appropriate. Remedial action costs shall include reasonable attorneys' fees and expenses. Recovery of remedial action costs shall be limited to those remedial actions that, when evaluated as a whole, are the substantial equivalent of a department-conducted or department-supervised remedial action. Substantial equivalence shall be determined by the court with reference to the rules adopted by the department under this chapter. . . . The prevailing party in such an action shall recover its reasonable attorneys' fees and costs. This section applies to all causes of action regardless of when the cause of action may have arisen.

A "remedial action" is

any action or expenditure consistent with the purposes of this chapter to identify, eliminate, or minimize any threat or potential threat posed by hazardous substances to human health or the environment including any investigative and monitoring activities with respect to any release or threatened release of a hazardous substance and any health assessments or health effects studies conducted in order to determine the risk or potential risk to human health.[19]

RCW 70.105D.040 states,

(1) [T]he following persons are liable with respect to a facility:
 (a) The owner or operator of the facility;
 (b) Any person who owned or operated the facility at the time of disposal or release of the hazardous substances;

 . . . .

(2) Each person who is liable under this section is strictly liable, jointly and severally, for all remedial action costs and for all natural resource damages resulting from the releases or threatened releases of hazardous substances.

An "owner or operator" is "[a]ny person with any ownership interest in the facility

or who exercises any control over the facility."[20] A "facility" includes "any

building" or "any site or area where a hazardous substance, other than a

---

[19] Former RCW 70.105D.020(26) (2007).
[20] Former RCW 70.105D.020(17)(a).

consumer product in consumer use, has been deposited, stored, disposed of, or placed, or otherwise come to be located."[21]

Auburn argues that it is entitled to recover the same amount of fees and costs under the lease and the MTCA. NW Mint identifies no costs recoverable under the MTCA that are not recoverable under the lease. Because we affirm NW Mint's liability under the lease, we do not address MTCA's applicability to this case.

Finally, NW Mint makes four challenges to the trial court's supplemental judgment and order awarding attorney fees and costs. First, NW Mint claims that the court "abused its discretion by accepting Auburn's billing statements without question and failing to deduct for wasteful and duplicative work." Second, NW Mint contends, "The trial court abused its discretion by failing to segregate the time related to Auburn's unsuccessful tenant improvement claim." Third, it alleges, "Auburn's attorneys spent unnecessary time on post-judgment matters, including the Fee Motion." Fourth, NW Mint asserts, "The trial court abused its discretion by awarding Auburn every penny of its claimed $425,767.28 in costs."

The trial court awarded $425,767.28 in litigation expenses, $1,116,279.33 in attorney fees, and $50,000.00 in "[f]ees/costs for December 2012 through entry of supplemental judgment." Its award also included a $10,000.00 credit for a security deposit. The court concluded, "The evidence supports a full award of all of Auburn's 'remedial action' legal expenses under MTCA and its attorneys'

---

[21] Former RCW 70.105D.020(5).

fees and costs under the 2002 Lease based on both the traditional 'lodestar' analysis and an 'equitable factors' analysis."

Generally, Washington courts apply the lodestar method to calculate attorney fees.[22] The court awarding attorney fees makes an independent determination about the reasonableness of the fees requested.[23] The fee applicant bears the burden of establishing that a fee is reasonable.[24]

To apply the lodestar method, the court considers first the number of hours reasonably expended on the matter.[25] "'[T]he attorneys must provide reasonable documentation of the work performed.'"[26] This documentation must include at least (1) the number of hours worked, (2) the type of work performed, and (3) the category of attorney who performed the work.[27] The court does not need to conduct an hour-by-hour analysis of each lawyer's time sheets, so long as the court provides a consideration of the relevant factors and reasons

[22] Mahler v. Szucs, 135 Wn.2d 398, 433, 957 P.2d 632 (1998), overruled on other grounds by Matsyuk v. State Farm Fire & Cas. Co., 173 Wn.2d 643, 272 P.3d 802 (2012).

[23] McGreevy v. Or. Mut. Ins. Co., 90 Wn. App. 283, 291, 951 P.2d 798 (1998) (quoting Absher Constr. Co. v. Kent Sch. Dist. No. 415, 79 Wn. App. 841, 847, 917 P.2d 1086 (1995)), overruled on other grounds by Panorama Vill. Condo. Owners Ass'n Bd. of Dirs. v. Allstate Ins. Co., 144 Wn.2d 130, 26 P.3d 910 (2001).

[24] Absher Constr. Co., 79 Wn. App. at 847 (citing Blum v. Stenson, 465 U.S. 886, 897, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984); Scott Fetzer Co. v. Weeks, 122 Wn.2d 141, 151, 859 P.2d 1210 (1993)).

[25] McGreevy, 90 Wn. App. at 291.

[26] McGreevy, 90 Wn. App. at 292 (quoting Bowers v. Transamerica Title Ins. Co., 100 Wn.2d 581, 597, 675 P.2d 193 (1983)).

[27] McGreevy, 90 Wn. App. at 292 (citing Bowers, 100 Wn.2d at 597).

sufficient to review the amount of the fee award.[28] "The awarding court should take into account the hours spent on unsuccessful claims, duplicated effort, or otherwise unproductive time."[29]

The second step in the lodestar method requires the court to determine if the hourly fee charged was reasonable.[30] As a third step, the court multiplies the numbers from the first two steps to produce the lodestar fee.[31]

Finally, the court may adjust the lodestar amount up or down to reflect factors not already considered.[32] The party proposing a deviation from the lodestar amount bears the burden of justifying it.[33]

When a contract specifies that a party may recover costs beyond statutory costs, the prevailing party is not limited to statutory costs, and the court will enforce the parties' intended meaning.[34]

The trial court found, "Auburn has provided contemporaneous records documenting the number of hours worked by its counsel as part of the remedial action and in the course of the litigation. These records adequately informed the court of the type of work performed and the category of attorney who performed the work." It also found, "The hourly rates charged by Auburn's counsel were

---

[28] McGreevy, 90 Wn. App. at 292 (quoting Absher Constr. Co., 79 Wn. App. at 848).

[29] McGreevy, 90 Wn. App. at 292 (citing Bowers, 100 Wn.2d at 597).

[30] McGreevy, 90 Wn. App. at 291.

[31] McGreevy, 90 Wn. App. at 291.

[32] Bowers, 100 Wn.2d at 598-99.

[33] Bowers, 100 Wn.2d at 598 (quoting Copeland v. Marshall, 641 F.2d 880, 892 (D.C. Cir. 1980)).

[34] Ethridge v. Hwang, 105 Wn. App. 447, 462, 20 P.3d 958 (2001).

reasonable at the time the client was billed for services. The attorneys representing all parties were very experienced and produced exceptional work."[35]

The court concluded, "The hours expended and hourly rates charged by Auburn's counsel as 'remedial action' attorneys' fees in this case were reasonable."

NW Mint claims that the trial court awarded fees for duplicative work, including "[e]xcessive contacts between Auburn's counsel," "[d]uplication of effort in reviewing pleadings and documents," and "[d]uplication of effort in conducting depositions or attending hearings." The court entered the following findings of fact:

> 9. The court also has made a reduction for duplicative efforts at trial. It was not necessary to have four partner level lawyers present at the entire trial, particularly due to the fact that one lawyer never made any oral representation to the court and the other lawyer's participation was limited to questioning two witnesses on the first day of trial. The presence of these attorneys was unnecessarily duplicative. Given that there were two experienced lawyers already representing Auburn at trial, the court does not find it necessary that Mr. Johnson was present for trial or that Mr. Hamell remained after his witnesses testified on the first day of trial. The court will reduce the award for their trial time. Mr. Johnson billed approximately 104 hours at $33,800, and Mr. Hamell billed 104 hours at $30,680.
> 10. Defendants argued that other time was duplicative as well. The court does not find this defense argument convincing. This case was aggressively litigated by the Defendants and Auburn had the right to respond in kind. The communication between plaintiff's counsels was reasonable and not excessive. The court finds that plaintiff's counsels reasonably allocated their resources for their motions practice and depositions. Finally, the court finds that the costs requested are appropriate given the broad definition of costs in MTCA claims.

---

[35] NW Mint does not challenge the hourly fees of Auburn's attorneys.

11. Aside from the specific reductions discussed above, the evidence established that Auburn's counsel expended a reasonable number of hours in representing Auburn with respect to Auburn's "remedial action" responses to the contamination caused by Defendants, and in achieving a successful litigation result to resolve Auburn's claims under MTCA and under the 2002 Lease.

12. As evidenced by the detailed documentation provided by Auburn, the hours billed by Auburn's counsel as part of the remedial action and in the course of the litigation of the MTCA and the 2002 Lease claims were not wasteful or duplicative.

NW Mint fails to cite any controlling authority in challenging the amount of communications among Auburn's attorneys or any authority showing that the entries were improperly vague. NW Mint also cites no authority establishing that having multiple attorneys review pleadings and documents is improper. Further, although NW Mint claims that the trial court abused its discretion by awarding more than $27,000 in fees when only one of the two attorneys who attended depositions and hearings for Auburn actually represented Auburn, it fails to indicate which specific entries that it is challenging.[36] Therefore, NW Mint fails to show that the trial court awarded fees for duplicative work.

NW Mint also alleges that the trial court failed to exclude the requested fees and costs related to Auburn's unsuccessful tenant improvement claim.[37] It argues that because the fact pattern for this claim was unrelated to the fact pattern for the contamination claim, the court "abused its discretion by

---

[36] NW Mint cites a declaration offering expert opinion on Auburn's cost and fee application, but the entries included in that document do not total $27,000.

[37] Section 14 of the lease required NW Mint to remove all of its improvements that Auburn requested it to remove.

-23-

unquestioningly accepting Auburn's unsupported estimate of the time its attorneys spent on the unsuccessful tenant improvement claim."

A trial court need not segregate attorney fees when it finds that claims are "so related that no reasonable segregation of successful and unsuccessful claims can be made."[38] The trial court found,

> Auburn was unsuccessful in its tenant improvement claim and the award should be reduced for the hours expended on that claim. The tenant improvement claim constituted a minimal amount of work however, and there are limited invoices that are applicable to it. . . . The court finds that the invoices were sufficient to determine the work performed in this lawsuit. Much of the testimony provided and the work performed regarding the tenant improvement claim related to Auburn's other property damage and contamination claims; hence, the claims were inextricably intertwined. The tenant improvement claim itself was simply a very minor part of the litigation. Nevertheless, a reduction is necessary and the court accepts the 100 hour estimate proffered by the Plaintiff totaling approximately $37,000 in reduction as reasonable and frankly, perhaps generous.

The court rejected NW Mint's argument that it was impossible to determine the number of hours expended on the tenant improvement claim. NW Mint cites no evidence indicating that the tenant improvement claim rested on a different common core of facts than the contamination claim. The trial court did not abuse its discretion.

NW Mint also contests the fees awarded for "post-judgment matters, including the Fee Motion." It challenges the court's order denying NW Mint's motion to strike declarations and exhibits supporting Auburn's motion for attorney fees and costs or to continue the fee hearing. In its motion, NW Mint claimed

---

[38] Hume v. Am. Disposal Co., 124 Wn.2d 656, 673, 880 P.2d 988 (1994).

that declarations and attached documents filed with Auburn's reply in support of its motion for attorney fees and costs constituted "new evidence" that NW Mint did not have adequate time to analyze. The trial court relied upon this challenged evidence when it determined that Auburn's fee request was reasonable.

We will reverse a trial court's denial of a continuance only upon a showing of both an abuse of discretion and resulting prejudice.[39] NW Mint cites no specific billing record to support its contention. The evidence submitted with Auburn's reply raised no new issues; it simply rebutted the arguments made in NW Mint's response to Auburn's motion for attorney fees and costs.[40] Additionally, Auburn provided many of the documents to NW Mint previously. We reject NW Mint's arguments.

Finally, NW Mint claims that Auburn was not entitled to recover deposition expenses, daily transcription charges, travel costs for parties, lay witness travel costs, support staff overtime, computer management software, copying charges, and meal expenses during trial. The lease's attorney fee and cost provision entitles Auburn to recover "its attorney's fees, statutory court costs, and all other litigation costs and expenses expended or incurred in connection with [an action

---

[39] State v. Herzog, 69 Wn. App. 521, 524, 849 P.2d 1235 (1993).

[40] See Colwell v. Holy Family Hosp., 104 Wn. App. 606, 616, 15 P.3d 210 (2001) ("The party moving for summary judgment must raise all of the issues on which it believes it is entitled to summary judgment in its initial motion. A trial court may not grant summary judgment to the moving party on issues that are first raised in rebuttal." (citing White v. Kent Med. Ctr., Inc., 61 Wn. App. 163, 168, 810 P.2d 4 (1991); Molloy v. City of Bellevue, 71 Wn. App. 382, 385, 859 P.2d 613 (1993))).

for breach of the lease] and in any appellate or collection proceedings. All sums due from Tenant to Landlord shall bear interest at the Default Interest rate."

The trial court concluded, "The legal services provided by Auburn's counsel were necessary and appropriate to guide and assist Auburn in the investigation and remediation of the former NW Mint Facility and to achieve a successful litigation result to resolve Auburn's claims under MTCA and under the 2002 Lease." NW Mint fails to show that the broad lease provision precludes Auburn from recovering the cited costs and expenses.

Both parties request fees and costs incurred on appeal under RAP 18.1, RCW 70.105D.080, RCW 4.84.330, and the lease. Because Auburn prevails in this appeal, it is entitled to recover attorney fees and costs under RAP 18.1, RCW 4.84.330, and the lease.

## CONCLUSION

Substantial evidence supports the trial court's findings, which support its conclusions that NW Mint breached its lease with Auburn. NW Mint fails to show that the trial court abused its discretion when it awarded Auburn all of its fees and costs under the lease. We do not reach the applicability of the MTCA to this

case. We affirm the trial court and award fees and costs to Auburn incurred on appeal upon its compliance with RAP 14.4.

WE CONCUR:

_Leach, J._

_Dwyer, J._                    _Cox, J._